PEREZ ET AL. *v.* LEDESMA ET AL.

No. 60. Argued November 17, 1970—Decided February 23, 1971

BLACK, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, STEWART, and BLACKMUN, JJ., joined. STEWART, J., filed a concurring opinion, in which BLACKMUN, J., joined, *post,* p. 89. DOUGLAS, J., filed an opinion dissenting in part, *post,* p. 90. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which WHITE and MARSHALL, JJ., joined, *post,* p. 93.

*Charles H. Livaudais* argued the cause for appellants. With him on the brief was *Robert J. Klees.*

*Jack Peebles* argued the cause for appellees. With him on the brief were *Stanley Fleishman* and *Robert Eugene Smith.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Given our decisions today in No. 2, *Younger* v. *Harris, ante,* p. 37; No. 7, *Samuels* v. *Mackell,* and No. 9, *Fernandez* v. *Mackell, ante,* p. 66; No. 4, *Boyle* v. *Landry, ante,* p. 77; No. 83, *Byrne* v. *Karalexis, post,* p. 216; and No. 41, *Dyson* v. *Stein, post,* p. 200, in which we have determined when it is appropriate for a federal court to intervene in the administration of a State's criminal laws, the disposition of this case should not be difficult.

I

Ledesma and the other appellees operated a newsstand in the Parish of St. Bernard, Louisiana, where they displayed for sale allegedly obscene magazines, books, and playing cards. As a result of this activity, appellees were charged in four informations filed in state court with violations of Louisiana statute, La. Rev. Stat. Ann. § 14:106 (Supp. 1970), and St. Bernard Parish Ordinance 21-60. After the state court proceedings had commenced by the filing of the informations, appellees instituted the instant suit in the United States District Court for the Eastern District of Louisiana, New Orleans Division. Since the appellees sought a judgment declaring a state statute of statewide application unconstitutional, together with an injunction against pending or future prosecutions under the statute, a three-judge court was convened. That court held the Louisiana statute constitutional on its face, but ruled that the arrests of appellees and the seizure of the allegedly obscene materials were invalid for lack of a prior adversary hearing on the character of the seized materials. Although the three-judge court declined to issue an injunction against the pending

or any future prosecutions, it did enter a suppression order and require the return of all the seized material to the appellees. 304 F. Supp. 662, 667–670 (1969). The local district attorney and other law enforcement officers appealed and we set the case for argument but postponed the question of jurisdiction to the hearing on the merits. 399 U. S. 924 (1970).[1]

It is difficult to imagine a more disruptive interference with the operation of the state criminal process short of an injunction against all state proceedings. Even the three-judge court recognized that its judgment would effectively stifle the then-pending state criminal prosecution.

> "In view of our holding that the arrests and seizures in these cases are invalid for want of a prior adversary judicial determination of obscenity, which holding requires suppression and return of the seized materials, *the prosecutions should be effectively terminated.*" 304 F. Supp., at 670. (Emphasis added.)

Moreover, the District Court retained jurisdiction "for the purposes of hereafter entering any orders necessary to enforce" its view of the proper procedures in the then-pending state obscenity prosecution. According to our holding in *Younger* v. *Harris, supra,* such federal interference with a state prosecution is improper. The propriety of arrests and the admissibility of evidence in state criminal prosecutions are ordinarily matters to be resolved by state tribunals, see *Stefanelli* v. *Minard,* 342

---

[1] Under 28 U. S. C. § 1253 an aggrieved party in any civil action required to be heard and determined by a district court of three judges "may appeal to the Supreme Court from an order granting or denying . . . an interlocutory or permanent injunction." The orders directing the suppression of evidence and the return of the seized material were injunctive orders against the appellants. Thus, we have jurisdiction to review those orders.

U. S. 117 (1951), subject, of course, to review by certiorari or appeal in this Court or, in a proper case, on federal habeas corpus. Here Ledesma was free to present his federal constitutional claims concerning arrest and seizure of materials or other matters to the Louisiana courts in the manner permitted in that State. Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate. See *Younger* v. *Harris, supra; Ex parte Young,* 209 U. S. 123 (1908). There is nothing in the record before us to suggest that Louisiana officials undertook these prosecutions other than in a good-faith attempt to enforce the State's criminal laws. We therefore hold that the three-judge court improperly intruded into the State's own criminal process and reverse its orders suppressing evidence in the pending state prosecution and directing the return of all seized materials.

## II

After crippling Louisiana's ability to enforce its criminal statute against Ledesma, the three-judge court expressed the view that the Parish of St. Bernard Ordinance 21–60 was invalid. Although the court below recognized that "it is not the function of a three-judge federal district court to determine the constitutionality or enjoin the enforcement of a local ordinance," the court nevertheless seized the "opportunity to express its views on the constitutionality of the ordinance." 304 F. Supp. 662, 670 n. 31 (1969). Judge Boyle, the District Judge who initially referred the action to the three-judge court, adopted that court's view and declared the parish ordinance invalid. There is considerable question concern-

ing the propriety of issuing a declaratory judgment against a criminal law in the circumstances of this case.[2]

## III

We are, however, unable to review the decision concerning the local ordinance because this Court has no jurisdiction to review on direct appeal the validity of a declaratory judgment against a local ordinance, such as St. Bernard Parish Ordinance 21–60. Even if an order granting a declaratory judgment against the ordinance had been entered by the three-judge court below (which it had not), that court would have been acting in the capacity of a single-judge court. We held in *Moody* v. *Flowers,* 387 U. S. 97 (1967), that a three-judge court was not properly convened to consider the constitutionality of a statute of only local application, similar to a local ordinance. Under 28 U. S. C. § 1253 we have jurisdiction to consider on direct appeal only those civil actions "required . . . to be heard and determined" by a three-judge court. Since the constitutionality of this parish ordinance was not "required . . . to be heard and determined" by a three-judge panel, there is no jurisdiction in this Court to review that question.

The fact that a three-judge court was properly convened in this case to consider the injunctive relief requested against the enforcement of the state statute, does not give this Court jurisdiction on direct appeal over other controversies where there is no independent juris-

---

[2] At the time the instant federal court suit was filed, there was pending in Louisiana state court a criminal prosecution under the parish ordinance. In *Samuels* v. *Mackell, supra,* we held that interference with pending state criminal prosecutions by declaratory judgments is subject to the same restrictions curbing federal interference by injunction. *Id.,* at 73. As indicated above, there are no facts present in this record to show that appellees would suffer irreparable injury of the kind necessary to justify federal injunctive interference with the state criminal processes.

dictional base. Even where a three-judge court is properly convened to consider one controversy between two parties, the parties are not necessarily entitled to a three-judge court and a direct appeal on other controversies that may exist between them.[3] See *Public Service Comm'n* v. *Brashear Freight Lines,* 306 U. S. 204 (1939).

In this case, the order granting the declaratory judgment was not issued by a three-judge court, but rather by Judge Boyle, acting as a single district judge. The three-judge court stated:

> "The view expressed by this court concerning the constitutionality of the ordinance is shared by the initiating federal district judge *and is adopted by reference in his opinion issued contemporaneously herewith."* 304 F. Supp., at 670 n. 31. (Emphasis added.)

The last clause of the quoted sentence indicates what, under *Moody* v. *Flowers,* must be the case: The decision granting declaratory relief against the Parish of St. Bernard Ordinance 21–60 was the decision of a single federal judge. This fact is confirmed by the orders entered by the two courts. The three-judge court entered the following order at the end of its opinion.

> "Accordingly, for the reasons assigned, it is ordered that judgment in both cases be entered decreeing:
> "1. That all seized materials be returned, instanter, to those from whom they were seized,

---

[3] Aside from the limited local application of the ordinance, which bars a direct appeal under *Moody* v. *Flowers,* 387 U. S. 97 (1967), there is a question whether a successful party can properly maintain an appeal. The statute, 28 U. S. C. § 1253, permits a direct appeal only from an order granting or denying an injunction. The State successfully opposed an injunction against the enforcement of the parish ordinance in the court below and now cannot appeal from its victory. See *Gunn* v. *University Committee to End the War in Viet Nam,* 399 U. S. 383, 391 (1970) (WHITE, J., concurring).

"2. That said materials be suppressed as evidence in any pending or future prosecutions of the plaintiffs,

"3. That the preliminary and permanent injunctions prayed for be denied, and

"4. That jurisdiction be retained herein for the issuance of such further orders as may be necessary and proper."

The order of the single-judge District Court is as follows:

"For the reasons assigned in the foregoing 3-Judge Court opinion, it is ordered that judgment be entered herein decreeing:

"1. That St. Bernard Parish Ordinance No. 21–60 is unconstitutional.

"2. That jurisdiction be retained herein for the issuance of such further orders as may be necessary and proper." 304 F. Supp., at 670–671.

The fact that the clerk of the District Court merged these orders into one judgment does not confer jurisdiction upon this Court. In the first place, our jurisdiction cannot be made to turn on an inadvertent error of a court clerk. Second, the jurisdictional statute by its own terms grants a direct appeal from "an *order* granting or denying" an injunction. 28 U. S. C. § 1253. (Emphasis added.) Since the order entered by the three-judge court omits any reference to declaratory relief, the discussion of such relief in the court's opinion is dictum.

The judgment of the court below is reversed insofar as it grants injunctive relief. In all other respects the judgment is vacated and the case remanded to the United States District Court with instructions to enter a fresh decree from which the parties may take an appeal to the Court of Appeals for the Fifth Circuit if they so desire.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE BLACK-MUN joins, concurring.

In joining the opinion and judgment of the Court, I add these few concurring words.

The three-judge District Court's decree suppressing the use of the seized material as evidence and ordering its return to the appellees was an injunctive order, from which an appeal was properly taken directly to this Court. 28 U. S. C. § 1253. The decree was plainly wrong under *Stefanelli* v. *Minard,* 342 U. S. 117, and I agree that it must be reversed. In *Stefanelli* we affirmed the refusal of a federal district court to suppress the use in a pending state prosecution of evidence that the petitioners alleged had been obtained in an unlawful search. Our ruling there is clearly applicable to the facts before us:

> "We hold that the federal courts should refuse to intervene in State criminal proceedings to suppress the use of evidence even when claimed to have been secured by unlawful search and seizure." 342 U. S., at 120.

See also *Cleary* v. *Bolger,* 371 U. S. 392, 400.

I also agree that the appeal from the declaratory judgment holding the parish ordinance unconstitutional is not properly before us. This Court has no power to consider the merits of that appeal for two quite distinct reasons, each sufficient to defeat our jurisdiction. First, the ordinance is neither a state statute nor of statewide application. The case thus presents *a fortiori* the situation in which the Court found no jurisdiction in *Moody* v. *Flowers,* 387 U. S. 97, 101. Second, the appeal is from the grant of declaratory relief, not from the grant or denial of an injunction, and jurisdiction under 28 U. S. C. § 1253 is therefore lacking. *Gunn* v. *University Committee to End the War in Viet Nam,* 399 U. S. 383; *id.,* at 391 (WHITE, J., concurring).

This is not a case in which the District Court's action on the prayer for declaratory relief was so bound up with its action on the request for an injunction that this Court might, on direct appeal, consider the propriety of declaratory relief on pendency grounds. Cf. *Zwickler* v. *Koota,* 389 U. S. 241; *Samuels* v. *Mackell, ante,* p. 66. Indeed, the District Court itself recognized that the request for a declaratory judgment regarding the local ordinance was so unrelated to the prayer for injunctive relief against the state statute that the single District Judge entered a separate order declaring the ordinance unconstitutional.

MR. JUSTICE DOUGLAS, dissenting in part.

## I

The three-judge panel was properly convened under 28 U. S. C. § 2281 to consider the validity of a Louisiana statute of general application. That court was also asked, however, to pass on an ordinance of St. Bernard Parish. But I agree with part III of the opinion of the Court written by MR. JUSTICE BLACK that we have no jurisdiction over that phase of the litigation.

It is by now elementary that a three-judge court may not be convened to consider the validity of a local ordinance or a statute of local application. *Moody* v. *Flowers,* 387 U. S. 97, 101. The three-judge court recognized that it had no jurisdiction to pass upon the constitutionality of the ordinance; but it expressed "its views . . . in the interest of judicial economy [since it was] shared by the initiating federal district judge and is adopted by reference in his opinion issued contemporaneously herewith." 304 F. Supp. 662, 670 n. 31. It then stated that "[W]e have examined the ordinance and find it to be unconstitutional and unenforceable." *Id.,* at 670.

The single District Judge then ordered that a judgment be entered, holding that the ordinance was uncon-

stitutional. 304 F. Supp., at 671. That order is obviously the judgment which is the basis of an appeal. Later on, the clerk also entered a judgment to that effect for the three-judge court.

The judgment entered pursuant to the order of the single District Judge should go to the Court of Appeals for review, not to this Court. Moreover, even if the judgment entered by the clerk was authorized by the three-judge court, it is not properly here. For the order or judgment concerning the ordinance would be here only if the three-judge court had pendent jurisdiction over the claim.

Pendent jurisdiction does extend to nonconstitutional grounds for challenging a statute when a constitutional challenge is also raised. *Siler* v. *Louisville & N. R. Co.,* 213 U. S. 175; *Davis* v. *Wallace,* 257 U. S. 478; *Sterling* v. *Constantin,* 287 U. S. 378, 393; *United States* v. *Georgia Pub. Serv. Comm'n,* 371 U. S. 285; *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73, 75–85; and *Flast* v. *Cohen,* 392 U. S. 83, 88–91. State causes of action have been appended to federal causes of action in a one-judge court where all causes of action arose out of the same set of facts. *United Mine Workers* v. *Gibbs,* 383 U. S. 715. This case, however, does not involve a challenge to one statute or a request for one award of relief on different grounds, but a challenge to two different laws on the same grounds. The only argument for considering both these laws together is that Ledesma was charged under both. This is not sufficient, under any ruling of this Court, to give jurisdiction, on direct appeal, over the ruling. The appellants did not challenge the jurisdiction of the three-judge court or the appellate jurisdiction of this Court over this claim. But subject matter jurisdiction of the federal courts may not be bestowed by the parties. *United States* v. *Griffin,* 303 U. S. 226, 229. The cases cited by appellants do not support jurisdiction

over this claim. *Zemel* v. *Rusk,* 381 U. S. 1, allowed a challenge to an administrative action, as not authorized by statute, to be joined with a constitutional attack on the statutes which purportedly authorized the action. *Milky Way Productions* v. *Leary* (together with *New York Feed Co.* v. *Leary*), 305 F. Supp. 288, was a *per curiam* affirmance, without opinion. 397 U. S. 98. The issues presented to this Court were conceded by all parties to be constitutional attacks on the obscenity statutes and the arrest warrant statutes of New York. Because the three-judge court had jurisdiction over the attack on the arrest warrant statutes, independent of any other claim, the issue of pendent jurisdiction was not involved and was not raised.* Therefore, that problem was not considered in our *per curiam,* and our affirmance was not a holding on pendent jurisdiction. We cannot decide *Perez* on the basis of *Milky Way,* but only on the basis of applicable precedent and reason. And no precedent or reason is advanced for any enlargement of pendent jurisdiction.

---

*None of the parties raised any question concerning pendent jurisdiction in this Court.

New York Feed complained that the arrest, without prior adversary hearing, was unconstitutional.

Milky Way attacked the arrest warrant statutes as unconstitutional "as applied in law," alleging they were overbroad, an illegal prior restraint, and vague.

The Attorney General of New York, in both cases, treated the claim as an attack on the constitutionality of the arrest warrant statutes and argued that they were constitutional.

The District Attorney argued that petitioners' attack on the arrest warrant statutes was improper because they did not preclude the adversary hearing. He did not, however, raise any jurisdictional questions as to the power of the three-judge court to pass on the legality of the arrests.

The city of New York raised no jurisdictional challenge.

In reply, both petitioners argued that the arrest warrant statutes were "unconstitutional as applied in law."

If a rewriting of the law on pendent jurisdiction is to be done, the Congress should do it.

The present judgment should be reviewed in the Court of Appeals, not here. *Rorick* v. *Comm'rs,* 307 U. S. 208.

## II

As to the orders of the three-judge court suppressing evidence in the prosecution under the Louisiana statute, which the Court sets aside, I dissent. My views, which are not congenial to the majority, are set forth at some length in *Younger* v. *Harris, ante,* p. 58, and *Dyson* v. *Stein, post,* p. 204, decided this day.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, concurring in part and dissenting in part.

This case presents questions regarding federal court intervention affecting the administration of state criminal laws that were not presented in No. 2, *Younger* v. *Harris, ante,* p. 37; No. 7, *Samuels* v. *Mackell,* and No. 9, *Fernandez* v. *Mackell, ante,* p. 66; No. 4, *Boyle* v. *Landry, ante,* p. 77; No. 83, *Byrne* v. *Karalexis, post,* p. 216; and No. 41, *Dyson* v. *Stein, post,* p. 200, all decided today.

Appellees operate a newsstand in the Parish of St. Bernard, Louisiana. On January 27, 1969, sheriff's officers of the parish, without warrants, raided the newsstand, seized allegedly obscene magazines, books, and playing cards from the shelves, and arrested appellee August M. Ledesma, Jr., an owner, for displaying obscene materials for sale. On February 10, 1969, four informations were filed in the state district court, two charging Ledesma with the crime of obscenity in violation of a Louisiana statute, La. Rev. Stat. Ann. § 14:106 (Supp. 1970), and two charging him with obscenity in violation of St. Bernard Parish Ordinance 21–60. The statute and ordinance appear as an Appendix to this opinion. On Febru-

ary 17, 1969, appellees filed the instant action in the United States District Court for the Eastern District of Louisiana, New Orleans Division. Their complaint sought a judgment under the Federal Declaratory Judgment Act, 28 U. S. C. § 2201, declaring the state statute and parish ordinance unconstitutional; an injunction against pending and future prosecutions under either enactment; and an injunction directing the return of the seized magazines, books, and playing cards and suppressing their use as evidence in any pending or future criminal prosecution against the appellees. A three-judge court was convened. Prior to the federal court hearing, the appellant entered a *nolle prosequi* in the state court on the two informations charging violation of the parish ordinance.

The three-judge court filed an opinion holding (a) that the Louisiana statute was constitutional on its face; (b) that the parish ordinance was unconstitutional on its face; and (c) that the arrest of appellee Ledesma and the seizure of the magazines, books, and playing cards were unconstitutional in the absence of a prior judicial adversary hearing determining that the seized materials were obscene. 304 F. Supp. 662 (1969). The court stated that because it was confident the appellants would comply with the court's views it was "unnecessary to issue any injunctions" against "pending or future prosecutions or future arrests and seizures." 304 F. Supp., at 670. In pertinent part the judgment entered on August 14, 1969, therefore decreed:

> "1. That all seized materials be returned, instanter, by the [appellants] to those [appellees] from whom they were seized,
>
> "2. That said materials be suppressed as evidence in any pending or future prosecutions of the [appellees],

"3. That the preliminary and permanent injunctions prayed for be denied,

"4. That St. Bernard Parish Ordinance No. 21–60 is unconstitutional." App. 106–107.

We postponed consideration of the question of jurisdiction to the hearing on the merits. 399 U. S. 924 (1970). In addition to the questions presented in the jurisdictional statement, our order requested the parties to brief and argue the following questions:

"(1) Was it an appropriate exercise of discretion for the three-judge court to grant the relief in paragraphs 1 and 2 of the judgment of August 14, 1969, in view of the pendency of the state prosecution charging violation of Louisiana Revised Statutes § 14:106?

"(2) Was it an appropriate exercise of discretion for the three-judge court in paragraph 4 of said judgment to declare the St. Bernard Parish Ordinance No. 21–60 unconstitutional?"

I agree with the Court (1) that this is a proper appeal to this Court, and (2) that it was not an appropriate exercise of discretion for the three-judge court to grant the relief in paragraphs 1 and 2 of the judgment of August 14, 1969. I dissent, however, from the holding of the Court that the declaratory judgment which is paragraph 4 of the judgment of the three-judge court is not properly before us for review. I think that it is and, on the merits, would hold that it was an appropriate exercise of discretion for the court in paragraph 4 to declare St. Bernard Parish Ordinance No. 21–60 unconstitutional. I would, therefore, reverse and set aside paragraphs 1 and 2 of the judgment of August 14, 1969, but in all other respects would affirm that judgment.

# I

## *Jurisdiction*

Appellants' assertion of a right of direct appeal to this Court relies upon 28 U. S. C. § 1253. That section permits an appeal in any civil action required to be heard and determined by a district court of three judges "from an order granting or denying . . . an interlocutory or permanent injunction."[1] Paragraph 3 of the order of August 14, 1969, decrees: "That the preliminary and permanent injunctions [against pending and future prosecutions] prayed for be denied." But § 1253 does not permit these appellants to appeal this portion of the judgment, since they prevailed to the extent of this denial of appellees' prayers for injunctive relief. *Gunn* v. *University Committee to End the War in Viet Nam,* 399 U. S. 383, 391 (1970) (WHITE, J., concurring). However, paragraphs 1 and 2 of the judgment are injunctive orders against appellants directing them not to use the seized materials as evidence against appellees in any pending or future prosecutions and directing the return of those materials. These provisions clearly qualified the judgment as an order "granting . . . an . . . injunction," from which appellants could appeal directly to this Court.

# II

## *The Injunctions*

The companion cases decided today hold that a federal court should not interfere by injunction with an existing

---

[1] The full text of 28 U. S. C. § 1253 is as follows:

"Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges."

state criminal prosecution pending against the federal court plaintiff at the time the federal action is brought, except upon a showing that great, immediate, and irreparable injury is threatened. Such a showing may be, for example, in the form of bad-faith harassment of the federal court plaintiff by state law enforcement officials. These decisions adhere to the policy established by this Court that, in the absence of such showing, "[i]t is generally to be assumed that state courts and prosecutors will observe [in the pending prosecution] constitutional limitations as expounded by this Court." *Dombrowski* v. *Pfister,* 380 U. S. 479, 484 (1965). While the three-judge court sustained the constitutionality of the state statute on its face (a holding not before us on this appeal), the court interfered with the pending state prosecution under the statute to the extent of ordering the return of the seized materials and suppressing their use as evidence in the prosecution, thus leaving the State free to proceed with the prosecution on the basis of other evidence. This interference was improper on this record. There is an utter absence of any evidence that the seizures and the arrest of appellee Ledesma, and the filing of the informations accusing Ledesma of violation of the state statute, were undertaken in bad faith to harass appellees, or for any purpose except the good-faith enforcement of the State's criminal laws. I have no occasion to consider, and intimate no view upon, the holding of the Federal District Court that, as to the seizures and the arrest of appellee Ledesma, "the conclusion is irresistible in logic and in law that none of these may be constitutionally undertaken prior to an adversary judicial determination of obscenity." 304 F. Supp., at 667.[2] That appeal to federal constitutional pro-

---

[2] For a contrary view to that of this three-judge court as to the necessity of a hearing prior to an arrest for obscenity, see *Milky Way Productions* v. *Leary,* 305 F. Supp. 288, 295–297 (SDNY 1969), aff'd, 397 U. S. 98 (1970).

tections was open to appellee Ledesma in the state prosecution by way of challenge, in any manner permitted by Louisiana criminal procedure, to the validity of the arrest, and objections to admission into evidence of, or motions to suppress use of, the materials. In *Dombrowski*, the Court expressly included controversies over the admissibility of evidence as controversies which, without more, involved "no special circumstances to warrant cutting short the normal adjudication of constitutional defenses in the course of a [state] criminal prosecution." 380 U. S., at 485. The Court said: "It is difficult to think of a case in which an accused could properly bring a state prosecution to a halt while a federal court decides his claim that certain evidence is rendered inadmissible by the Fourteenth Amendment." *Id.*, at 485 n. 3. While there may be circumstances in which a federal court could properly adjudicate such a claim, this record discloses none which justified this three-judge court in doing so. I therefore join the Court in concluding that paragraphs 1 and 2 of the judgment should be reversed and set aside.

## III

*The Declaratory Judgment as to the Parish Ordinance*

Threshold questions must be answered before the merits of the declaratory judgment which is paragraph 4 of the judgment of the three-judge court are reached.

The first threshold question is whether the declaratory judgment is properly before us for review. Two opinions, both written by Judge Boyle who initiated the three-judge panel, were filed on July 14, 1969, one for the three-judge court and the other a separate opinion of Judge Boyle. Judge Boyle's opinion for the three judges explained: "Although it is not the function of a three-judge federal district court to determine the constitutionality or enjoin the enforcement of a local ordinance,

as distinguished from statutes of state-wide application, Moody v. Flowers, 387 U. S. 97 (1967), the court takes this opportunity to express its views on the constitutionality of the ordinance in the interest of judicial economy. The view expressed by this court concerning the constitutionality of the ordinance is shared by the initiating federal district judge and is adopted by reference *in his opinion* issued contemporaneously herewith." 304 F. Supp., at 670 n. 31 (emphasis added). Judge Boyle's separate opinion was a brief statement: "For the reasons assigned in the foregoing 3-Judge Court opinion, it is ordered that judgment be entered herein decreeing: 1. That St. Bernard Parish Ordinance No. 21–60 is unconstitutional. 2. That jurisdiction be retained herein for the issuance of such further orders as may be necessary and proper." 304 F. Supp., at 671.

The Court holds that we have no jurisdiction to review the declaratory judgment on the premise that the declaratory judgment against the local ordinance was not issued by the three-judge court but rather by Judge Boyle acting as a single judge. With all respect this is not the case. Both the Court and my Brothers DOUGLAS and STEWART insist that Judge Boyle's separate statement was in fact a judgment. I would suppose Judge Boyle himself is the best authority as to that and he expressly referred to the statement as "his opinion." Appeals are, of course, taken from judgments and not from opinions. No judgment was entered by Judge Boyle pursuant to his separate opinion and therefore there existed no judgment pursuant to the order of the single judge to go to the Court of Appeals for review. The only judgment entered in the case was that entered by the three-judge court on August 14, 1969. Since the injunctions in paragraphs 1 and 2 rendered that judgment appealable directly to this Court, paragraph 4 of that judgment, the declaratory judgment, is necessarily before us.

However, other considerations require that we decide whether the three-judge court properly rendered the declaratory judgment. Our *per curiam* affirmance in *Milky Way Productions* v. *Leary*, 305 F. Supp. 288 (SDNY 1969), aff'd, 397 U. S. 98 (1970), fully supports the action of the three-judge court in doing so. That case did not present attacks on a statute and ordinance but rather attacks on two different New York statutes. The first attack was on N. Y. Penal Law § 235.00 (1965), New York's general obscenity statute. The second attack was on N. Y. Code Crim. Proc. §§ 148–150 (Supp. 1970–1971). The District Court held that a three-judge court was required to deal with the attack on § 235.00 since the claim was that that section was facially unconstitutional. However, the attack on §§ 148–150 of the Code of Criminal Procedure was not that those sections were facially unconstitutional but only that those sections were unconstitutionally invoked before there had been an adversary judicial determination on the obscenity of the publications in question (*i. e.*, as applied). The District Court acknowledged that the attack on the Code provisions was thus probably not for determination by three judges, but "as a simple claim of official lawlessness, cognizable by one judge." 305 F. Supp., at 295. Nevertheless, the District Court, invoking the principle that once three-judge court jurisdiction is established on one claim, the court may consider other issues that alone would not have called for three judges, held that, since there was three-judge jurisdiction of the claim of the facial unconstitutionality of § 235.00, jurisdiction existed also to determine the merits of the claim that the criminal procedure provisions were unconstitutionally applied. 305 F. Supp., at 295–296. Our affirmance sustained this holding. Plainly that affirmance governs this case and sustains the propriety of the action of the three-judge court in passing on the constitutionality of the ordinance. Ap-

pellants concede that *Milky Way* forecloses any challenge on their part to the action of the three-judge court. Indeed, they regard the action of the three-judge court as supported by the cases in this Court authorizing three-judge courts to consider attacks on statutes on nonconstitutional grounds when those courts are properly convened to hear constitutional challenges to the statutes.[3]

The appellants argue, however, that no controversy requisite to relief under the Federal Declaratory Judgment Act existed after the *nolle prosequi* was entered. This argument presents the second threshold question.

Appellants rely upon *Golden* v. *Zwickler,* 394 U. S. 103 (1969). In that case a New York criminal statute prohibited the distribution of anonymous handbills in election campaigns. A distributor of anonymous handbills opposing the re-election of a Congressman sought in federal court a judgment declaring the statute unconstitutional. The federal action was brought after reversal by the New York courts of the appellee's conviction for distributing handbills during an earlier campaign of the Congressman. See *Zwickler* v. *Koota,* 389 U. S. 241 (1967). Appellee desired to distribute handbills during a forthcoming campaign of that Congressman, but the Congressman had retired from Congress to become a justice of the New York Supreme Court. In those circumstances the Court held that no "controversy" requisite to declaratory relief existed, since Zwickler's only target was a particular Congressman and "the prospect was neither real nor immediate of a campaign involving the Congressman." 394 U. S., at 109.

---

[3] *Flast* v. *Cohen,* 392 U. S. 83, 88–91 (1968); *Zemel* v. *Rusk,* 381 U. S. 1, 5–7 (1965); *United States* v. *Georgia Pub. Serv. Comm'n,* 371 U. S. 285, 287–288 (1963); *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73, 75–85 (1960); *Milky Way Productions* v. *Leary,* 305 F. Supp., at 295.

The situation here is quite different, however. "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941). Appellees' complaint expressly alleges, and there was no evidence or finding to the contrary, that appellees "desire to continue to keep for sale and to sell" the publications and playing cards in question. Thus, unlike the situation in *Golden,* the question of the constitutionality of the ordinance is "presented in the context of a specific live grievance." 394 U. S., at 110. This conclusion is buttressed by the finding of the three-judge court that "[appellees] fear prosecution [under the ordinance] at some future date." 304 F. Supp., at 670. Indeed, in light of the appellants' aggressive prosecution of appellees, the inference is permissible that any attempts by appellees to continue to display the questioned publications for sale might well again be met with prosecutions under both the statute and ordinance. There is no question that there is a continuing controversy between the appellants and the State involving the sale of allegedly obscene publications. Appellants did not assert the contrary before the District Court, nor do they assert the contrary here.[4] I conclude that

---

[4] Despite the order to return the seized materials, appellants were not without evidence on which to prosecute appellee Ledesma. The evidence obtained on the night of January 27, 1969, was not just the seized materials. The parties stipulated at the hearing before the three-judge court that immediately before a sheriff's officer arrested Ledesma, the officer purchased two allegedly obscene magazines from Ledesma, and that another officer purchased two other and different publications from him. The District Court expressly excepted these purchased publications from those ordered returned,

it cannot be said that the three-judge court erred in finding that there existed the "controversy" requisite under the Federal Declaratory Judgment Act.

The third threshold question is whether the state prosecution under the ordinance was "pending" so as to make federal intervention inappropriate. The fact is, as I have already noted, that informations against appellee Ledesma for violation of the ordinance were outstanding when this federal suit was filed. However, the *nolle prosequi* of those informations was entered before the three-judge court convened and heard the case. That court therefore treated the case as one in which no prosecution under the ordinance was pending. This was not error. The availability of declaratory relief was correctly regarded to depend upon the situation at the time of the hearing and not upon the situation when the federal suit was initiated. See *Golden* v. *Zwickler*, 394 U. S., at 108. The principles of comity as they apply to federal court intervention, treated by the Court today in Nos. 2, 4, 7, 9, 41, and 83, see *supra*, at 93, present this issue. The key predicate to answering the question whether a federal court should stay its hand, is whether there is a pending state prosecution where the federal court plaintiff may have his constitutional defenses heard and determined. Ordinarily, that question may be answered merely by examining the dates upon which the federal and state actions were filed. If the state prosecution was first filed and if it provides an adequate forum for the adjudication of constitutional rights, the federal court should not ordinarily intervene. When, however, as here, at the time of the federal hearing there is no state prosecution to which the federal

saying, "Of course, [appellants] cannot be ordered to return the purchased materials, as in the instance of those seized, since title thereto has passed." 304 F. Supp., at 667 n. 22.

court plaintiff may be relegated for the assertion of his constitutional defenses, the primary reason for refusing intervention is absent. Here, there was no other forum for the adjudication of appellees' constitutional objections to the ordinance.

There is, of course, some intrusion into a state administration of its criminal laws whenever a federal court renders a declaratory judgment upon the constitutionality of a state criminal enactment. The Court holds today in *Samuels* v. *Mackell, supra,* that considerations of federalism ordinarily make the intrusion impermissible if a state prosecution under that enactment is proceeding at the time the federal suit is filed. The Court says, "[I]n cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and . . . where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well." *Id.,* at 73. But considerations of federalism are not controlling when no state prosecution is pending and the only question is whether declaratory relief is appropriate. In such case, the congressional scheme that makes the federal courts the primary guardians of constitutional rights, and the express congressional authorization of declaratory relief, afforded because it is a less harsh and abrasive remedy than the injunction, become the factors of primary significance.

The controversy over the power of federal courts to declare state statutes unconstitutional and to enjoin their enforcement has roots that reach back at least to *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), where in a contract action this Court held that a State could be sued by a citizen of another State. "That decision . . . created such a shock of surprise throughout the country that, at the

first meeting of Congress thereafter, the Eleventh Amendment to the Constitution was almost unanimously proposed, and was in due course adopted by the legislatures of the States." *Hans* v. *Louisiana,* 134 U. S. 1, 11 (1890) (Bradley, J.). The amendment was thought to have overruled *Chisholm.* Although the amendment might have been construed to give a broad immunity from federal suits to States and state officials acting pursuant to state policy, that construction was rejected in *Osborn* v. *Bank of the United States,* 9 Wheat. 738, 847–848 (1824). *Osborn* involved a confiscatory state tax on a federal instrumentality. In sustaining a federal court injunction against the state tax, Chief Justice Marshall analyzed the controversy over federal judicial power as testing the viability of our federal system:

> "The eleventh amendment . . . has exempted a State from the suits of citizens of other States . . . ; and the very difficult question is to be decided, whether, in such a case, the Court may act upon the agents employed by the State, and on the property in their hands.
>
> "Before we try this question by the constitution, it may not be time misapplied, if we pause for a moment, and reflect on the relative situation of the Union with its members, should the objection prevail.
>
> "A denial of jurisdiction forbids all inquiry into the nature of the case. It applies to cases perfectly clear in themselves; to cases where the government is in the exercise of its best established and most essential powers, as well as to those which may be deemed questionable. It asserts, that the agents of a State, alleging the authority of a law void in itself, because repugnant to the constitution, may arrest the execution of any law in the United States." 9 Wheat., at 847–848.

Though recognizing the sensitivity of granting injunctions in this context, the Court held that neither the Eleventh Amendment nor any principles of federalism prevented the lower federal courts from giving such relief where necessary to vindicate paramount federal law in a case where a State was not itself a party of record. The broad reach of the reasoning in *Osborn* has since been qualified, see generally L. Jaffe, Judicial Control of Administrative Action 213–222 (1965), but the basic principle that in appropriate circumstances federal courts will exercise their equity power against state officials to protect rights secured and activities authorized by paramount federal law remains firmly embedded in our jurisprudence. *Pennoyer* v. *McConnaughy,* 140 U. S. 1, 9–18 (1891); *Ex parte Young,* 209 U. S. 123 (1908); *Truax* v. *Raich,* 239 U. S. 33, 37–38 (1915); *Terrace* v. *Thompson,* 263 U. S. 197, 214–215 (1923). See also *Leiter Minerals* v. *United States,* 352 U. S. 220, 225–226 (1957) (Frankfurter, J.).

*Ex parte Young* was the culmination of efforts by this Court to harmonize the principles of the Eleventh Amendment with the effective supremacy of rights and powers secured elsewhere in the Constitution. During the years between *Osborn* and *Young,* and particularly after the Civil War, Congress undertook to make the federal courts the primary guardians of constitutional rights. This history was reviewed in *Zwickler* v. *Koota,* 389 U. S., at 245–249. The principal foundations of the expanded federal jurisdiction in constitutional cases were the Civil Rights Act of 1871, 17 Stat. 13, which in § 1 empowered the federal courts to adjudicate the constitutionality of actions of any person taken under color of state statute, ordinance, regulation, custom, or usage, see 42 U. S. C. § 1983, 28 U. S. C. § 1343 (3), and the Judiciary Act of 1875, 18 Stat. 470, which gave lower federal courts general federal-question

jurisdiction, see 28 U. S. C. § 1331. These two statutes, together, after 1908, with the decision in *Ex parte Young,* established the modern framework for federal protection of constitutional rights from state interference. That framework has been strengthened and expanded by subsequent acts of Congress and subsequent decisions of this Court.

*Ex parte Young* involved a state regulatory statute with penal sanctions. At the suit of railroad stockholders, a federal circuit court temporarily enjoined the railroad from complying with the statute, and also temporarily enjoined Young, the state Attorney General, from instituting any proceedings to enforce the statute. Young nevertheless brought an enforcement proceeding in a state court, and was thereupon held in contempt by the circuit court. He brought habeas corpus in this Court, contending that the circuit court lacked jurisdiction to hold him in contempt. This Court held, first, that the original suit was properly within the general federal-question jurisdiction of the circuit court; second, that "individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action," 209 U. S., at 155–156; and, third, that a federal court of equity has power in appropriate circumstances to enjoin a future state criminal prosecution: "When [the state] proceeding is brought to enforce an alleged unconstitutional statute, which is the subject matter of inquiry in a suit already pending in a Federal court, the latter court having first obtained jurisdiction over the subject matter, has the right, in both civil and criminal cases, to hold and maintain such jurisdiction, to the exclusion

of all other courts, until its duty is fully performed." 209 U. S., at 161–162.

The decision in *Ex parte Young* provoked a reaction not unlike that which greeted *Chisholm* v. *Georgia*. Opposition focused principally on the power of lower federal courts, and of single judges of such courts, to issue preliminary injunctions, often *ex parte,* against the enforcement of state statutes, generally regulatory statutes carrying penalties. See generally *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 154 (1963); H. Hart & H. Wechsler, The Federal Courts and the Federal System 848–849 (1953); Hutcheson, A Case for Three Judges, 47 Harv. L. Rev. 795, 803–810 (1934); Currie, The Three-Judge District Court in Constitutional Litigation, 32 U. Chi. L. Rev. 1, 5–7 (1964). The opinion in *Ex parte Young* anticipated the problem. The Court noted the objection "that the necessary result of upholding this suit in the Circuit Court will be to draw to the lower Federal courts a great flood of litigation of this character, where one Federal judge would have it in his power to enjoin proceedings by state officials to enforce the legislative acts of the State, either by criminal or civil actions." 209 U. S., at 166. The same year the case was decided Congress considered a measure to disable the lower federal courts from enjoining enforcement of state statutes, but the proposal failed to attract sufficient support for passage. See 42 Cong. Rec. 4848–4849 (1908). Two years later, a similar measure passed the House, see 46 Cong. Rec. 313, 316 (1910), but the Senate would not accept it. See F. Frankfurter and J. Landis, The Business of the Supreme Court 143 (1927). However, the same year, Congress did respond to *Ex parte Young*. It did not attempt to overrule the case by constitutional amendment or by statute; it did not seek to contain it by expanding the statutory bar against federal injunctions of state proceedings, 28 U. S. C. § 2283, beyond

stays of suits already instituted; it did not follow the precedent of the Eleventh Amendment by excluding a class of litigation from federal jurisdiction; nor did it anticipate the technique of the Norris-LaGuardia Act by forbidding the use of the injunction in a defined class of cases, see 47 Stat. 70, 29 U. S. C. §§ 101–115. Rather, Congress ratified the active role assigned to the federal courts by the post-Civil War legislation and accepted the basic holdings of *Ex parte Young,* but provided that a preliminary injunction against enforcement of a state statute could be issued only by a three-judge district court, see 36 Stat. 557, now 28 U. S. C. § 2281,[5] and that the decision of such a court granting or denying an injunction would be directly appealable to this Court. See 28 U. S. C. § 1253. Thus the Three-Judge Court Act confirmed Congress' acceptance of *Ex parte Young* and the course of federal adjudication of the constitutionality of state statutes which it represented,[6] and Congress has never departed from that

[5] The Three-Judge Court Act of 1910 originally applied only to interlocutory injunctions against enforcement of state statutes. See § 17, 36 Stat. 557. A 1913 amendment extended the requirements to interlocutory injunctions against enforcement of state administrative orders. Act of March 4, 1913, c. 160, 37 Stat. 1013. The Judiciary Act of 1925 extended the three-judge requirement to permanent injunctions. 43 Stat. 938. However, in *Smith* v. *Wilson,* 273 U. S. 388 (1927), it was held that the three-judge requirement applied only where the application for a permanent injunction was coupled with an application for an interlocutory injunction. The 1948 revision of the statute made the three-judge requirement applicable to requests for either interlocutory or permanent relief, whether or not the other form of relief was sought. Act of June 25, 1948, 62 Stat. 968.

[6] In 1913 Congress dealt with another major defect in the federal injunction procedure. Injunction suits were commonly instituted in federal court shortly after the enactment of complex state regulatory measures and prior to their construction by the state courts. The result was that in one case a federal court gave an initial construction to the state statute and then, on the basis of that

acceptance on any of the several occasions when it has amended the Act. As Professor Wright has written, "[T]he doctrine of Ex parte Young seems indispensable to the establishment of constitutional government and the rule of law." C. Wright, Handbook of the Law of Federal Courts 186 (2d ed. 1970).[7]

construction, adjudicated its constitutionality, thereby excluding the state courts altogether. See generally Lockwood, Maw, & Rosenberry, The Use of the Federal Injunction in Constitutional Litigation, 43 Harv. L. Rev. 426, 428–429 (1930). The remedy provided by Congress, 37 Stat. 1013, is currently codified in 28 U. S. C. § 2284, which provides in pertinent part:

"A district court of three judges shall, before final hearing, stay any action pending therein to enjoin, suspend or restrain the enforcement or execution of a State statute or order thereunder, whenever it appears that a State court of competent jurisdiction has stayed proceedings under such statute or order pending the determination in such State court of an action to enforce the same. If the action in the State court is not prosecuted diligently and in good faith, the district court of three judges may vacate its stay after hearing upon ten days notice served upon the attorney general of the State."

The statute has proved largely ineffectual principally because of the stay requirement, which protects the constitutional interests of the federal court plaintiffs. See Hart & Wechsler, *supra*, at 854–855; Hutcheson, *supra*, at 822–823; Lockwood, Maw, & Rosenberry, *supra*, at 452–453. However, in cases where construction of complex state regulatory law is critical to a constitutional decision, the federal courts have developed their own techniques for securing state court consideration of issues of state law. See, *e. g.*, *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210 (1908); *Railroad Comm'n of Texas* v. *Pullman Co.*, 312 U. S. 496 (1941). The narrow scope of the doctrine of federal abstention was delineated in *Zwickler* v. *Koota*, 389 U. S. 241 (1967). See also ALI, Study of the Division of Jurisdiction Between State and Federal Courts § 1371, pp. 282–298 (1969); Note, Federal-Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv. L. Rev. 604 (1967).

[7] The American Law Institute, in comments in connection with its proposed codification of the abstention doctrine, observes: "Suits in which it is claimed that state legislative or administrative action is invalid because contrary to controlling federal law present an

During the period leading up to and following *Ex parte Young* the federal injunction suit became the classic method for testing the constitutionality of state statutes.[8]  The injunctive remedy was strong medicine, and the Three-Judge Court Act did not eliminate the defects in and the widespread hostility to the injunction procedure.  The procedure was unsatisfactory for both private plaintiffs and state defendants: a plaintiff had the burden of proving the traditional equity requirements for an injunction; and if the plaintiff prevailed in court, an injunction issued against the defendant state official, paralyzing enforcement of the state statute pending further review.  Consequently, in 1934, without expanding or reducing the subject matter jurisdiction of the federal courts, or in any way diminishing the continuing vitality of *Ex parte Young* with respect to federal injunctions, Congress empowered the federal courts to grant a new remedy, the declaratory judgment. See Act of June 14, 1934, c. 512, 48 Stat. 955, now 28 U. S. C. § 2201.

The express purpose of the Federal Declaratory Judgment Act was to provide a milder alternative to the injunction remedy.  The House Committee Report stated, "The principle involved in this form of procedure is to confer upon the courts the power to exercise in some in-

especially appealing case for original federal jurisdiction.  The danger of state court hostility to the federal claim is greatest in such suits.  Jurisdiction of the federal courts to hear such cases has been established at least since *Ex parte Young,* and it has been rightly observed by a distinguished judge that 'the authority and finality of *Ex parte Young* can hardly be overestimated.' Hutcheson, *A Case for Three Judges,* 47 Harv. L. Rev. 795, 799 n. 9 (1934)." (Citation omitted.)  ALI, Study of the Division of Jurisdiction Between State and Federal Courts 282 (1969).

[8] After Congress accepted the basic principles of *Ex parte Young,* this Court promulgated new Rules of Practice for federal equity, which removed many of the objections to equity procedure.  See 226 U. S. 627 (1912), and in particular Rule 73, 226 U. S., at 670.

stances preventive relief; a function now performed rather clumsily by our equitable proceedings and inadequately by the law courts." H. R. Rep. No. 1264, 73d Cong., 2d Sess., 2 (1934). Of particular significance on the question before us, the Senate report makes it even clearer that the declaratory judgment was designed to be available to test state criminal statutes in circumstances where an injunction would not be appropriate:

"The declaratory judgment differs in no essential respect from any other judgment except that it is not followed by a decree for damages, injunction, specific performance, or other immediately coercive decree. It declares conclusively and finally the rights of parties in litigations over a contested issue, a form of relief which often suffices to settle controversies and fully administer justice. . . . It has been employed in State courts . . . for the declaration of rights contested under a statute or municipal ordinance, where it was not possible or necessary to obtain an injunction.

.        .        .        .        .

"The procedure has been especially useful in avoiding the necessity, now so often present, of having to act at one's peril or to act on one's own interpretation of his rights, or abandon one's rights because of a fear of incurring damages. So now it is often necessary, in the absence of the declaratory judgment procedure, to violate or purport to violate a statute in order to obtain a judicial determination of its meaning or validity. Compare *Shredded Wheat Co.* v. *City of Elgin* (284 Ill. 389, 120 N. E. 248, 1918), where the parties were denied an injunction against the enforcement of a municipal ordinance carrying a penalty, and were advised to purport to violate the statute and then their rights could be determined, with *Erwin Billiard Parlor* v.

*Buckner* (156 Tenn. 278, 300 S. W. 565, 1927), where a declaratory judgment under such circumstances was issued and settled the controversy. . . .

"The fact is that the declaratory judgment has often proved so necessary that it has been employed under other names for years, and that in many cases the injunction procedure is abused in order to render what is in effect a declaratory judgment. For example, in the case of *Pierce* v. *Society of Sisters* (268 U. S. 510, 525 . . . 1925), the court issued an injunction against the enforcement of an Oregon statute which was not to come into force until 2 years later; in rendering a judgment declaring the statute void, the court in effect issued a declaratory judgment by what was, in effect, apparently, an abuse of the injunction. See also *Village of Euclid* v. *Ambler Realty Co.* (272 U. S. 365 . . . 1926). Much of the hostility to the extensive use of the injunction power by the Federal courts will be obviated by enabling the courts to render declaratory judgments.

.        .        .        .        .

"Finally, it may be said that the declaratory-judgment procedure has been molded and settled by thousands of precedents, so that the administration of the law has been definitely clarified. The Supreme Court mentioned one of its principal purposes in *Terrace* v. *Thompson* (263 U. S. 197, 216 . . . 1923), by Butler, J., when it said:

" 'They are not obliged to take the risk of prosecutions, fines, and imprisonment and loss of property in order to secure an adjudication of their rights.' "
S. Rep. No. 1005, 73d Cong., 2d Sess., 2–3, 6 (1934).

Both before and after the enactment of the Federal Declaratory Judgment Act, the practice of those States that provided a declaratory remedy was to make it available

to test the validity of criminal legislation. See E. Borchard, Declaratory Judgments 1024 (2d ed. 1941). Professor Borchard, a leading proponent of the Act, testified: "Most courts are unwilling to grant injunctions . . . on the ground that it is a criminal statute, but you can get a declaratory judgment in States that have it." Hearings on H. R. 5623 before a Subcommittee of the Senate Committee on the Judiciary, 70th Cong., 1st Sess., 19 (1928). He testified further that "when Federal courts do get power to render declaratory judgments, instead of rendering an injunction, as is now done, that requires three judges, plaintiff will get a declaratory judgment. You would not be able to get an injunction, in such cases, from one judge, but you could get a declaratory judgment as to your rights." *Id.*, at 39. Indeed, early in the history of the Act this Court applied it to test the constitutionality of a federal statute carrying criminal sanctions. See *Currin* v. *Wallace,* 306 U. S. 1 (1939). Professor Borchard also introduced a written statement in the hearings, which stated in part:

> "[T]he declaratory judgment serves another useful purpose. It often happens that courts are unwilling to grant injunctions to restrain the enforcement of penal statutes or ordinances, and relegate the plaintiff to his option, either to violate the statute and take his chances in testing constitutionality on a criminal prosecution, or else to forego, in the fear of prosecution, the exercise of his claimed rights. Into this dilemma no civilized legal system operating under a constitution should force any person. The court, in effect, by refusing an injunction informs the prospective victim that the only way to determine whether the suspect is a mushroom or a toadstool, is to eat it. Assuming that the plaintiff has a vital interest in the enforcement of the challenged statute or ordinance, there is no reason why a declaratory judgment should not be issued, instead of

compelling a violation of the statute as a condition precedent to challenging its constitutionality." Hearings on H. R. 5623, *supra,* at 75–76.

The legislative history of the Federal Declaratory Judgment Act is overwhelming that declaratory judgments were to be fully available to test the constitutionality of state and federal criminal statutes. Much of the hostility to federal injunctions referred to in the Senate report was hostility to their use against state officials seeking to enforce state regulatory statutes carrying criminal sanctions; this was the strong feeling that produced the Three-Judge Court Act in 1910, the Johnson Act of 1934, 28 U. S. C. § 1342, and the Tax Injunction Act of 1937, 28 U. S. C. § 1341. The Federal Declaratory Judgment Act was intended to provide an alternative to injunctions against state officials, except where there was a federal policy against federal adjudication of the class of litigation altogether. See discussion, *infra,* at 126–128, of *Great Lakes Co.* v. *Huffman,* 319 U. S. 293 (1943). Moreover, the Senate report's clear implication that declaratory relief would have been appropriate in *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), and *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926), both cases involving federal adjudication of the constitutionality of a state statute carrying criminal penalties, and the report's quotation from *Terrace* v. *Thompson,* which also involved anticipatory federal adjudication of the constitutionality of a state criminal statute, make it plain that Congress anticipated that the declaraory judgment procedure would be used by the federal courts to test the constitutionality of state criminal statutes.

This history compels rejection of the Court's suggestion, *ante,* at 86 n. 2, that although no informations were pending at the time of the hearing, declaratory relief was inappropriate in the absence of a showing "that appellees would suffer irreparable injury of the kind necessary to

justify federal injunctive interference with the state criminal processes." Congress expressly rejected that limitation and to engraft it upon the availability of the congressionally provided declaratory remedy is simply judicial defiance of the congressional mandate. It is nothing short of judicial repeal of the statute. If the statute is to be repealed or rewritten, it must be done by Congress, not this Court.

*Ex parte Young* makes clear that the most significant factor determining the propriety of federal intervention is whether a state proceeding exists that was initiated *before* the federal suit was filed. The Court there upheld a federal court's injunction against future state proceedings where the injunction was in aid of the federal court's jurisdiction, but the Court expressly excepted from its holding the case where a state proceeding exists which was pending at the time federal jurisdiction attached. Specifically, the Court stated, "But the Federal court cannot, of course, interfere in a case where the proceedings were already pending in a state court." 209 U. S., at 162. The Court cited *Harkrader* v. *Wadley,* 172 U. S. 148 (1898), in support, thus making clear that the ruling was influenced by the statutory provision, first enacted in 1793, prohibiting federal injunctions against proceedings pending in any court of a State. The history of that provision, now 28 U. S. C. § 2283, was recently traced in *Atlantic Coast Line R. Co.* v. *Brotherhood of Locomotive Engineers,* 398 U. S. 281 (1970). However, the statutory bar applies only to prosecutions begun *before* the federal suit is filed and does not preclude injunctions against the institution of *future* prosecutions. See generally Warren, Federal and State Court Interference, 43 Harv. L. Rev. 345, 366–378 (1930). Thus, the general rules that follow from *Ex parte Young* are, first, that where there is no pending state proceeding when the federal suit is filed, a federal court can adjudicate consti-

tutional claims against state officials and issue such orders as are necessary to preserve its jurisdiction; and, second, that where a state proceeding exists that was pending at the time suit was filed in federal court the federal court should ordinarily decline to render either declaratory or injunctive relief.[9]

These rules were developed further in the light of additional considerations in *Dombrowski* v. *Pfister,* 380 U. S. 479 (1965). *Dombrowski* confirmed the well-established principle that constitutional defenses to a state criminal charge must be initially tested in state rather than in federal courts. See *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943); *Cameron* v. *Johnson,* 390 U. S. 611, 618 (1968); compare *Stefanelli* v. *Minard,* 342 U. S. 117 (1951), with *Rea* v. *United States,* 350 U. S. 214 (1956). However, *Dombrowski* also recognized that exceptional circumstances may justify federal intervention when the opportunity to raise constitutional defenses at the state criminal trial does not assure protection of the constitutional rights at stake. *Dombrowski* considered two situations in which "exceptional circumstances" can exist. First, if in order to discourage conduct protected by the First Amendment or by some other provision of the Constitution,[10] a State brings or threatens to

---

[9] I put to one side the question not presented in *Ex parte Young,* or in this case, whether federal court relief would be proper when a state prosecution pending at the time of the federal hearing was begun after the federal suit was filed.

[10] Declaratory relief should be available, whether the conduct inhibited is expressive or other conduct alleged to be protected by the Constitution. Of course, the special sensitivity and importance of First Amendment rights (their sensitivity to "chilling") is a necessary consideration in evaluating the claim of inhibition. The deterrence emanating from the existence of a statute purporting to prohibit constitutionally protected expression is itself plainly inconsistent with the First Amendment, *Zwickler* v. *Koota,* 389 U. S. 241,

bring a criminal prosecution in bad faith for the purpose of harassment, the bringing of the prosecution or the threat is itself a constitutional deprivation since it subjects a person to a burden of criminal defense which he should not have to bear, and there then exists a situation "in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." [11] *Dombrowski* v. *Pfister, supra,* at 485; see *Cameron* v. *Johnson, supra,* at 621; cf. *Achtenberg* v. *Mississippi,* 393 F. 2d 468, 474–475 (CA5 1968). Accordingly, in this context a civil suit is an appropriate means to cut short the unconstitutional state prosecution. The civil suit for remedial relief may appropriately be brought in federal court since the federal courts are the primary guardians of constitutional rights. *Zwickler* v. *Koota, supra.* Second, where a criminal statute prohibits or seems to prohibit constitutionally protected conduct, and to that extent is unconstitutionally vague or overbroad (a contention not made as to the state statute in this case), the opportunity to raise constitutional defenses at a criminal trial is inadequate to protect the underlying constitutional rights, since in that

---

252 (1967); *Baggett* v. *Bullitt,* 377 U. S. 360 (1964), which was intended to protect vigorous, robust, and unpopular speech without a threat of punishment under state law. See, *e. g., Whitney* v. *California,* 274 U. S. 357, 375–376 (1927) (Brandeis, J., concurring); *Stromberg* v. *California,* 283 U. S. 359, 369 (1931); *Roth* v. *United States,* 354 U. S. 476, 484 (1957); *NAACP* v. *Button,* 371 U. S. 415, 429 (1963); *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964).

[11] Bad-faith harassment can, of course, take many forms, including arrests and prosecutions under valid statutes where there is no reasonable hope of obtaining a conviction, see, *e. g., Cameron* v. *Johnson, supra,* at 621, and a pattern of discriminatory enforcement designed to inhibit the exercise of federal rights, see, *e. g., Bailey* v. *Patterson,* 323 F. 2d 201 (CA5 1963). Cf. ALI, Study of the Division of Jurisdiction Between State and Federal Courts § 1372 (7), pp. 308–310 (1969).

situation a substantial number of people may well avoid
the risk of criminal prosecution by abstaining from con-
duct thought to be proscribed by the statute. Even per-
sons confident that their contemplated conduct would be
held to be constitutionally protected and that accordingly
any state conviction would be overturned may be deterred
from engaging in such conduct by the prospect of be-
coming enmeshed in protracted criminal litigation, and
by the risk that in the end, years later, their confidence
will prove to have been misplaced and their resources
wasted. This deterrence is magnified by the scope that
vagueness or overbreadth gives for discriminatory or
capricious enforcement. Federal anticipatory relief is
justified here because it is a principal function of the
federal courts to vindicate the constitutional rights of all
persons—those who want to obey state laws as well as
those prepared to defy them.[12] Thus in *Dombrowski* we
held that in cases in these categories federal courts may
properly intervene in order to assure the full protection
of federal constitutional rights.[13]

---

[12] The federal declaratory judgment is not a prize to the winner
of a race to the courthouses, but rather a declaration of rights that
obviates the need to risk a state criminal proceeding or a race to
the courthouses. Within the limits of Art. III, see *Golden* v.
*Zwickler*, 394 U. S. 103 (1969), doctrines of ripeness should be so
fashioned as to give adequate room for this kind of relief.

[13] Title 28 U. S. C. § 1343 is an independent basis of federal juris-
diction where the plaintiff seeks vindication of constitutional rights;
and, where this provision is invoked together with 42 U. S. C. § 1983,
exhaustion of state remedies is not required. *McNeese* v. *Board
of Education*, 373 U. S. 668 (1963). Federal court abstention is
particularly inappropriate in cases brought under the statutes de-
signed specifically to authorize federal protection of civil rights. As
Professor Wechsler has stated, "There Congress has declared the his-
toric judgment that within this precious area . . . there is to be no
slightest risk of nullification by state process. The danger is un-
happily not past. It would be moving in the wrong direction to
reduce the jurisdiction in this field—not because the interest of the

Taken together, the principles of *Ex parte Young* and *Dombrowski* establish that whether a particular case is appropriate for federal intervention depends both on whether a state proceeding is pending and on the ground asserted for intervention. Where the ground is bad-faith harassment, intervention is justified whether or not a state prosecution is pending. · Intervention in such cases does not interfere with the normal good-faith enforcement of state criminal law by constitutional means, and does not necessarily require a decision on the constitutionality of a state statute. It simply prevents particular unconstitutional use of the State's criminal law in bad faith against the federal plaintiff. Under *Douglas* v. *City of Jeannette, supra,* at 164, a person has no immunity from a state prosecution "brought lawfully and in good faith," but he is entitled to federal relief from a state prosecution which amounts to bad-faith harassment.[14]

The situation is different where the plaintiff seeks federal intervention on the ground that a state statute is unconstitutional, but does not allege facts showing bad-faith harassment. In cases of this sort, on whatever provision the claim of unconstitutionality rests, the justification for intervention is that individuals should be able to exercise their constitutional rights without running the risk of becoming lawbreakers. This justification applies with full force where there is a continuing live controversy and federal intervention is sought when there is no state prosecution in which the statute may be tested. However, where federal intervention is sought after a

state is smaller in such cases, but because its interest is outweighed by other factors of the highest national concern." Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 230 (1948).

[14] Whether in this context 28 U. S. C. § 2283 bars injunctive relief I need not consider since there is no injunction here.

state prosecution has commenced and while it is pending, the interests protected by federal intervention must be weighed against the broad countervailing principles of federalism. The pending state proceeding ordinarily provides an existent, concrete opportunity to secure vindication of constitutional claims in the state courts, with ultimate review by this Court. In this situation collateral resort to a federal court will not speed up the resolution of the controversy since that will not come to an end in any event until the state litigation is concluded. Moreover, federal intervention may disrupt the state proceeding through the issuance of necessary stays or the burdensome necessity for the parties to proceed in two courts simultaneously. Federal adjudication of the matters at issue in the state proceeding may otherwise be an unwarranted and unseemly duplication of the State's own adjudicative process. For these reasons, federal courts should not ordinarily intervene by way of either declaratory or injunctive relief in cases where a state court prosecution exists that began before the federal suit was filed, and the federal court plaintiff alleges only that the state statute being applied to him is unconstitutional. Cf. *Brillhart* v. *Excess Ins. Co.*, 316 U. S. 491, 494–495 (1942); Wright, *supra*, at 205. The interests served by federal intervention in that context are plainly outweighed by the principles of comity essential to our federal system.

When no state proceeding is pending and federal intervention is therefore appropriate,[15] the federal court must decide which of the requested forms of relief should be granted. Ordinarily a declaratory judgment will be appropriate if the case-or-controversy requirements of Article III are met, if the narrow special factors war-

---

[15] I do not consider here the types of relief available in cases of bad-faith harassment discussed *supra*, at n. 11.

ranting federal abstention are absent, and if the declaration will serve a useful purpose in resolving the dispute. See generally *Zwickler* v. *Koota, supra; Golden* v. *Zwickler, supra.* This general rule carries out the unambiguous intention of Congress expressed in the Federal Declaratory Judgment Act and reflected in the committee reports, *supra.* The propriety of an injunction should be considered separately and in light of the traditional requirements of equity jurisprudence as applied to the protection of constitutional rights. See, *e. g., Douglas* v. *City of Jeannette, supra; Ex parte Young, supra; Dombrowski* v. *Pfister, supra; Cameron* v. *Johnson, supra; Zwickler* v. *Koota, supra;* see also Hart & Wechsler, *supra,* at 862–864.

It follows that the Court's statement today in *Samuels* v. *Mackell,* that in cases where the state criminal prosecution is pending, "the same equitable principles relevant to the propriety of an injunction must be taken into consideration . . . in determining whether to issue a declaratory judgment, and that where an injunction would be impermissible . . . declaratory relief should ordinarily be denied as well," is not applicable when determining whether to issue a declaratory judgment in a case where no state criminal prosecution is pending. Its applicability is precluded by the nature of the remedy created by the Federal Declaratory Judgment Act, and by our decisions under the Act, culminating in *Zwickler* v. *Koota, supra,* which establish that the considerations governing the grant of a declaratory judgment are quite different from those governing the grant of an injunction, even though both forms of relief are discretionary and thus, in the broad sense of the term, "equitable" in nature. The application of the *Mackell* statement when no criminal prosecution is pending would run counter to our decision this Term in *Wisconsin* v. *Constantineau,* 400 U. S. 433, decided January 19, 1971, where we flatly rejected the

proposition that federal courts should stay their hand until the state courts have been asked to pass on a statute clearly unconstitutional on its face. We there said:

"Congress could of course have routed all federal constitutional questions through the state court systems, saving to this Court the final say when it came to review of the state court judgments. But our First Congress [in the first Judiciary Act, 1 Stat. 73] resolved differently and created the federal court system and in time granted the federal courts various heads of jurisdiction, which today involve most federal constitutional rights. . . .

". . . We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court should stay its hand and not decide the question before the state courts decided it." 400 U. S., at 437–438, 439.

Moreover, the prerequisites for injunctive and declaratory relief are different. The availability of an alternative adequate legal remedy ordinarily bars an injunction, but does not bar declaratory relief, see Fed. Rule Civ. Proc. 57, unless the alternative remedy was expressly created by statute. See *Katzenbach* v. *McClung,* 379 U. S. 294, 295–296 (1964). Similarly, irreparable injury must be shown in a suit for an injunction, but not in an action for declaratory relief. *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 241 (1937). Of course, neither remedy may be afforded in the absence of a live controversy. *United States* v. *Alaska S. S. Co.,* 253 U. S. 113 (1920); *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941); *Zwickler* v. *Koota, supra,* at 244 n. 3. However, the existence of an actual controversy and the adequacy of declaratory relief to resolve it are issues often presenting particular difficulty in declaratory judgment actions, and it is to these

issues that judicial discretion in such actions is primarily directed. See *Public Service Comm'n of Utah* v. *Wycoff Co.*, 344 U. S. 237 (1952).

The effects of injunctive and declaratory relief in their impact on the administration of a State's criminal laws are very different. See generally *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 152–155 (1963). An injunction barring enforcement of a criminal statute against particular conduct immunizes that conduct from prosecution under the statute. A broad injunction against all enforcement of a statute paralyzes the State's enforcement machinery: the statute is rendered a nullity. A declaratory judgment, on the other hand, is merely a declaration of legal status and rights; it neither mandates nor prohibits state action. See *Flemming* v. *Nestor*, 363 U. S. 603, 607 (1960); Currie, The Three-Judge District Court in Constitutional Litigation, 32 U. Chi. L. Rev. 1, 15–16 (1964).

Of course, a favorable declaratory judgment may nevertheless be valuable to the plaintiff though it cannot make even an unconstitutional statute disappear. A state statute may be declared unconstitutional *in toto*—that is, incapable of having constitutional applications; or it may be declared unconstitutionally vague or overbroad—that is, incapable of being constitutionally applied to the full extent of its purport. In either case, a federal declaration of unconstitutionality reflects the opinion of the federal court that the statute cannot be fully enforced. If a declaration of total unconstitutionality is affirmed by this Court, it follows that this Court stands ready to reverse any conviction under the statute. If a declaration of partial unconstitutionality is affirmed by this Court, the implication is that this Court will overturn particular applications of the statute, but that if the statute is narrowly

construed by the state courts it will not be incapable of constitutional applications. Accordingly, the declaration does not necessarily bar prosecutions under the statute, as a broad injunction would. Thus, where the highest court of a State has had an opportunity to give a statute regulating expression a narrowing or clarifying construction but has failed to do so, and later a federal court declares the statute unconstitutionally vague or overbroad, it may well be open to a state prosecutor, after the federal court decision, to bring a prosecution under the statute if he reasonably believes that the defendant's conduct is not constitutionally protected and that the state courts may give the statute a construction so as to yield a constitutionally valid conviction. Even where a declaration of unconstitutionality is not reviewed by this Court, the declaration may still be able to cut down the deterrent effect of an unconstitutional state statute. The persuasive force of the court's opinion and judgment may lead state prosecutors, courts, and legislators to reconsider their respective responsibilities toward the statute. Enforcement policies or judicial construction may be changed, or the legislature may repeal the statute and start anew. Finally, the federal court judgment may have some *res judicata* effect, though this point is not free from difficulty and the governing rules remain to be developed with a view to the proper workings of a federal system.[16] What is clear, however, is that even though a declaratory judgment has "the force and effect of a final judgment," 28 U. S. C. § 2201, it is a

---

[16] The Senate Report noted that "[t]he declaratory judgment is a final, binding judgment between adversary parties and conclusively determines their rights." S. Rep. No. 1005, 73d Cong., 2d Sess., 5 (1934). But in my view the federal court's duty to render a declaratory judgment is not the less whatever may be its *res judicata* effect as between the parties to the litigation.

much milder form of relief than an injunction. Though it may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but is not contempt.

The Court's opinion in *Zwickler* v. *Koota* confirmed that the considerations governing the grant of the two remedies are quite different. *Zwickler* v. *Koota* distinguished the prayer for injunction from the prayer for declaratory relief and held squarely that the District Court erred in denying declaratory relief on the ground that there was no "showing . . . of 'special circumstances to justify . . .' injunctive relief." 389 U. S., at 253–254. The Court expressly held that "a request for a declaratory judgment that a state statute is overbroad on its face must be considered independently of any request for injunctive relief against the enforcement of that statute. We hold that a federal district court *has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction*." *Id.*, at 254 (emphasis added). See also *Malone* v. *Emmet*, 278 F. Supp. 193 (MD Ala. 1967).

*Great Lakes Co.* v. *Huffman*, 319 U. S. 293 (1943), is not contrary to my conclusion. That case was an action by employers for a declaration that a state unemployment compensation scheme which imposed a tax upon them was unconstitutional. Congress has always treated judicial interference with the enforcement of tax laws as a subject governed by unique considerations, and this Court has consistently enforced the congressional command that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U. S. C. § 1341. This Court, without relying on the

particular terms of the statute, has taken its underlying policy to require that federal courts stay completely out of the field of anticipatory adjudication of tax cases so long as an adequate remedy is otherwise available. In *Great Lakes* "we held that declaratory relief that a state tax was unconstitutional should be denied by the federal court. The basis of our ruling was that since Congress had prohibited the federal courts from enjoining state taxes where an adequate remedy was available in the state courts, declaratory relief should also be withheld." *Public Service Comm'n of Utah* v. *Wycoff Co.*, 344 U. S. 237, 253 (1952) (DOUGLAS, J., dissenting) (citation omitted). Thus *Great Lakes* adhered to the congressional recognition of the unique considerations presented by anticipatory tax litigation. *Ibid.* As the statutes barring anticipatory relief in federal tax cases, 26 U. S. C. § 7421 (1964 ed., Supp. V); 28 U. S. C. § 2201 (express exception for federal taxes), make entirely clear, the unique considerations that were the basis of *Great Lakes* relate not so much to considerations of federalism as to the peculiar needs of tax administration.[17] Cf. Agricultural Adjustment Act amendments of

---

[17] "[T]axes are the life-blood of government, and their prompt and certain availability an imperious need. Time out of mind, therefore, the sovereign has resorted to more drastic means of collection." *Bull* v. *United States*, 295 U. S. 247, 259–260 (1935); see also *Bank of Commerce* v. *Tennessee*, 161 U. S. 134, 146 (1896). In *Phillips* v. *Commissioner*, 283 U. S. 589, 595–596 (1931), Mr. Justice Brandeis said for the Court, "Where . . . adequate opportunity is afforded for a later judicial determination of the legal rights, summary proceedings to secure prompt performance of pecuniary obligations to the government have been consistently sustained. Property rights must yield provisionally to governmental need. Thus, while protection of life and liberty from administrative action alleged to be illegal, may be obtained promptly by the writ of habeas corpus, the statutory prohibition of any 'suit for the

1935, § 30, 49 Stat. 770, amending Act of May 12, 1933, 48 Stat. 31 (7 U. S. C. § 623 (a)). In contrast, there is no statutory counterpart of 28 U. S. C. § 1341 applicable to intervention in state criminal prosecutions.[18]

purpose of restraining the assessment or collection of any tax' postpones redress for the alleged invasion of property rights . . . ." (citations omitted). Cf. *Matthews* v. *Rodgers,* 284 U. S. 521, 525–526 (1932). The special reasons justifying the policy of federal non-interference with state tax collection are obvious. The procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules. State tax agencies are organized to discharge their responsibilities in accordance with the state procedures. If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts. See generally S. Rep. No. 1035, 75th Cong., 1st Sess. (1937). These considerations make clear that the underlying policy of the anti-tax-injunction statute, 28 U. S. C. § 1341, relied on in *Great Lakes,* bars all anticipatory federal adjudication in this field, not merely federal injunctions. Very different considerations apply in the context of state criminal statutes challenged as unconstitutional. At issue on one side are fundamental personal rights, not property rights. At risk on the other is not the current financing of state government, but the future enforcement of a particular criminal statute.

[18] Title 28 U. S. C. § 2283 is certainly not analogous to the prohibition of federal anticipatory relief in tax cases. That statute applies only where there is a pending state proceeding, *Dombrowski* v. *Pfister,* 380 U. S., at 484 n. 2, whereas the present discussion concerns the propriety of federal relief where no state proceeding is pending. Moreover, unlike the tax statutes, § 2283 is not directed to any particular class of litigation, criminal or otherwise, but is designed to protect the process of orderly state court adjudication gen-

Of course, the grant or denial of a declaratory judgment is a matter of sound judicial discretion. The standards for the exercise of this discretion have been articulated in *Aetna Life Ins. Co.* v. *Haworth, supra; Public Service Comm'n of Utah* v. *Wycoff Co., supra,* and in *Zwickler* v. *Koota, supra;* see *supra,* at 120–126. Where a federal court is asked to declare the validity or invalidity of a state statute, this discretion is to be exercised "in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to

---

erally. When Congress has wanted to protect particular categories of state business from anticipatory federal intervention, it has known how to say so. See 28 U. S. C. §§ 1341, 1342. No such statute applies to state criminal law administration. Finally, the Federal Declaratory Judgment Act plainly evinces a congressional intent that the statutory term "injunction" in § 2283 not be read to include declaratory judgments. An analogous question was before us recently in *Mitchell* v. *Donovan,* 398 U. S. 427 (1970). There we were called on to decide whether an order of a three-judge court granting or denying a declaratory judgment may be appealed to this Court under 28 U. S. C. § 1253, which provides that with certain exceptions "any party may appeal to the Supreme Court from an order granting or denying . . . an . . . *injunction* in any civil action . . . required . . . to be . . . determined by a district court of three judges." (Emphasis added.) The direct-appeal provision of § 1253 obviously reflects the particular sensitivity of granting or denying an injunction in those important cases required to be heard by three-judge courts. See generally Currie, The Three-Judge District Court in Constitutional Litigation, 32 U. Chi. L. Rev. 1 (1964). The Court clearly had those considerations in mind when it observed, "While there are similarities between injunctions and declaratory judgments, there are also important differences. . . . [T]his Court's jurisdiction under [§ 1253] is to be literally construed. . . . It would hardly be faithful to such a construction to read the statutory term 'injunction' as meaning 'declaratory judgment.' " 398 U. S., at 430–431.

guard and protect rights secured by the Constitution." *Ex parte Royall,* 117 U. S. 241, 251 (1886). However, as the Court said in *Zwickler* v. *Koota:*

> "Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims. Plainly, escape from that duty is not permissible merely because state courts also have the solemn responsibility, equally with the federal courts, '. . . to guard, enforce, and protect every right granted or secured by the Constitution of the United States . . . ,' *Robb* v. *Connolly,* 111 U. S. 624, 637. . . . The judge-made doctrine of abstention, first fashioned in 1941 . . . sanctions such escape only in narrowly limited 'special circumstances.' *Propper* v. *Clark,* 337 U. S. 472, 492." 389 U. S., at 248.

Thus, where no criminal prosecution involving the federal court parties is pending when federal jurisdiction attaches, declaratory relief determining the disputed constitutional issue will ordinarily be appropriate to carry out the purposes of the Federal Declaratory Judgment Act and to vindicate the great protections of the Constitution.

I conclude that the three-judge court properly exercised its discretion in issuing a declaratory judgment upon the constitutionality of St. Bernard Parish Ordinance No. 21–60. I also agree with the District Court that the ordinance is unconstitutional on its face because "mortally infected with the vice of vagueness." 304 F. Supp., at 670. Appellants do not assert the contrary.

Paragraphs 1 and 2 of the judgment entered August 14, 1969, should be reversed and the judgment in all other respects should be affirmed.

## APPENDIX TO OPINION OF BRENNAN, J.

LOUISIANA REVISED STATUTES ANNOTATED

§ 14:106. Obscenity

A. Obscenity is the intentional:

(1) Exposure of one's person in a public place in such manner that any part of a sex organ may be seen by another person, with the intent of arousing sexual desire.

(2) Production, sale, exhibition, gift, or advertisement with the intent to primarily appeal to the prurient interest of the average person, of any lewd, lascivious, filthy or sexually indecent written composition, printed composition, book, magazine, pamphlet, newspaper, story paper, writing, phonograph record, picture, drawing, motion picture film, figure, image, wire or tape recording or any written, printed or recorded matter of sexually indecent character which may or may not require mechanical or other means to be transmitted into auditory, visual or sensory representations of such sexually indecent character.

(3) Possession with the intent to sell, exhibit, give or advertise any of the pornographic material of the character as described in Paragraph (2) above, with the intent to primarily appeal to the prurient interest of the average person.

(4) Performance by any person or persons in the presence of another person or persons with the intent of arousing sexual desire, of any lewd, lascivious, sexually indecent dancing, lewd, lascivious or sexually indecent posing, lewd, lascivious or sexually indecent body movement.

(5) Solicitation or attempt to entice any unmarried person under the age of seventeen years to commit any act prohibited by this section.

(6) Requirement by a person, as a condition to a sale, allocation, consignment or delivery for resale of any paper, magazine, book, periodical or publication to a purchaser or consignee, that such purchaser or consignee receive for resale any other article, book or publication reasonably believed by such purchaser or consignee to contain articles or material of any kind or description which are designed, intended or reasonably calculated to or which do in fact appeal to the prurient interests of the average person in the community, as judged by contemporary community standards, or the denying or threatening to deny any franchise or to impose any penalty, financial or otherwise, by reason of the failure of any person to accept such articles or things or by reason of the return thereof.

(7) Display of nude pictures of a man, woman, boy or girl in any public place, except as works of art exhibited in art galleries.

B. In prosecutions for obscenity, lack of knowledge of age or marital status shall not constitute a defense.

C. Whoever commits the crime of obscenity shall be fined not less than one hundred dollars nor more than five hundred dollars, or imprisoned for not more than six months, or both.

When a violation of Paragraphs (1), (2), (3), and (4) of Subsection (A) of this Section is with or in the presence of an unmarried person under the age of seventeen years, the offender shall be fined not more than one thousand dollars, or imprisoned for not more than five years with or without hard labor, or both.

Amended by Acts 1958, No. 388, § 1; Acts 1960, No. 199, § 1; Acts 1962, No. 87, § 1; Acts 1968, No. 647, § 1, emerg. eff. July 20, 1968, at 1:30 P.M.

POLICE JURY
ST. BERNARD PARISH
ST. BERNARD COURTHOUSE ANNEX
CHALMETTE, LOUISIANA

EXTRACT OF THE OFFICIAL PROCEEDINGS OF THE POLICE JURY OF THE PARISH OF ST. BERNARD, STATE OF LOUISIANA, TAKEN AT THE REGULAR MEETING HELD IN THE POLICE JURY ROOM OF THE COURTHOUSE ANNEX, AT CHALMETTE, LOUISIANA, ON NOVEMBER 2, 1960, AT ELEVEN O'CLOCK (11:00) A. M.

On motion of Celestine Melerine, seconded by Joseph V. Papania and upon recommendation of the District Attorney of the Parish of St. Bernard, the following Ordinance was adopted:

ORDINANCE NO. 21–60

An Ordinance known as the Ordinance of St. Bernard Parish, relative to prohibiting and defining the offense of obscenity and indecent literature, adding thereto the offense of "attempt," and prescribing penalties for the violation thereof.

SECTION 1.

Offense of obscenity defined and prohibited.

SECTION 2.

BE IT ORDAINED, by the Police Jury of the Parish of St. Bernard that obscenity is prohibited and is hereby defined as the intentional.

134

SECTION 3.

BE IT FURTHER ORDAINED, that public personal exposure of the female breast or the sexual organs or fundament of any person of either sex.

SECTION 4.

BE IT FURTHER ORDAINED, that production, sale, exhibition, possession with intent to display, or distribution of any obscene, lewd, lascivious, prurient or sexually indecent print, advertisement, picture, photograph, written or printed composition, model, statue, instrument, motion picture, drawing, phonograph recording, tape or wire recording, or device or material of any kind.

SECTION 5 (a)

BE IT FURTHER ORDAINED that the performance of any dance, song, or act in any public place, or in any public manner representing or portraying or reasonably calculated to represent or portray any act of sexual intercourse between male and female persons, or any act of perverse sexual intercourse or contact, or unnatural carnal copulation, between persons of any sex, or between persons and animals.

SECTION 5 (b)

OR FURTHER, the performance in any public place, or any public manner of any obscene, lewd, lustful, lascivious, prurient or sexually indecent dance, or the rendition of any obscene, lewd, lustful, lascivious, prurient or sexually indecent song or recitation.

SECTION 6.

BE IT FURTHER ORDAINED, PRODUCTION, POSSESSION WITH INTENT to display, exhibition, distribution, or sale of any literature as defined herein containing one or more pictures of nude or semi-nude

female persons, wherein the female breast or any sexual organ is shown or exhibited, and where, because of the number or manner of portrayal in which such pictures are displayed in such literature, they are designed to appeal predominantly to the prurient interest.

SECTION 7.

BE IT FURTHER ORDAINED, that it shall also be unlawful for any person to attempt to commit any of the violations set forth in this section.

SECTION 8.

BE IT FURTHER ORDAINED, that any person upon conviction of a violation of this section shall be sentenced to serve not more than ninety (90) days, or pay a fine of not more than one hundred dollars ($100.00) or both, in the discretion of the Court.

BE IT FURTHER ORDAINED, that persons convicted of an attempt to violate this section shall be sentenced to not more than one-half of the maximum penalty prescribed, or pay not more than half of the maximum fine or both, as set forth above.

SECTION 9.

BE IT FURTHER ORDAINED, that the word literature as used herein means and includes a book, booklet, pamphlet, leaflet, brochure, circular, folder, handbill or magazine. The word picture as used herein means and includes any photograph, lithograph, drawing, sketch, abstract, poster, painting, figure, image, silhouette, representation or facsimile.

SECTION 10.

BE IT FURTHER ORDAINED, that this Ordinance shall be published in the Official Journal of the Parish, the St. Bernard Voice.

This Ordinance having been submitted to a vote, the vote thereon was as follows:

YEAS: Henry C. Schindler, Jr., Joseph V. Papania, Peter N. Huff, Peter Perniciaro, Louis P. Munster, John W. Booth, Sr., Claude S. Mumphrey, Celestine Melerine, Edward L. Jeanfreau, and Mrs. Blanche Molero.

NAYS: None.

ABSENT: None.

And the Ordinance was declared adopted on this, the 2nd day of November, 1960.

/s/ VALENTINE RIESS,
(Valentine Riess),
President.

/s/ JOSEPH E. SORCI,
(Joseph E. Sorci),
Secretary.

## CERTIFICATE

I CERTIFY THAT the above and foregoing is a true and correct copy of an ordinance adopted by the St. Bernard Parish Police Jury at a Regular meeting held at Chalmette, Louisiana, in the Police Jury Room at the Courthouse Annex on the 2nd day of November, 1960.

Witness my hand and the Seal of the St. Bernard Parish Police Jury this 11th day of February, 1969.

/s/ R. M. McDOUGALL,
(R. M. McDougall),
Secretary.