James Robert BURRUS,
Petitioner-Appellee,

v.

Charles TURNBO, Warden,
Respondent-Appellant.

No. 83–1951.

United States Court of Appeals,
Ninth Circuit.

Argued Jan. 11, 1984.

Submitted Jan. 27, 1984.

Decided Sept. 25, 1984.

Harry Hellerstein, San Francisco, Cal., for petitioner-appellee.

Judith A. Whetstine, Asst. U.S. Atty., San Francisco, Cal., for respondent-appellant.

Before GOODWIN, PREGERSON, and NELSON, Circuit Judges.

PREGERSON, Circuit Judge:

## INTRODUCTION

■ Warden Charles Turnbo of the Pleasanton Federal Correctional Institution (Warden) appeals from an order of the United States District Court for the Northern District of California. The order permanently enjoins the Warden from recognizing a writ of habeas corpus *ad prosequendum* [1] asking him to transfer petitioner James Robert Burrus (Burrus) to the custody of Arizona authorities. Arizona seeks the transfer for the purpose of trying Burrus on various fraud and forgery counts.

The district court granted the injunction because Arizona had once before obtained custody of Burrus to prosecute these charges, but had returned him to the federal authorities before bringing him to trial. The court reasoned that in so doing, Arizona had flatly violated the speedy trial provisions of the Interstate Agreement on Detainers (IAD), Pub.L. No. 91–538, 84 Stat.

---

**1.** The district court's order mistakenly refers to the document that Arizona authorities presented to the Warden as a "detainer." Actually, the state's prosecutors have presented a writ of habeas corpus *ad prosequendum*, which was issued by an Arizona state court. This writ is used by one sovereign to obtain and try prisoners held in another sovereign's jurisdiction. *See Carbo v. United States*, 364 U.S. 611, 614–15, 81 S.Ct. 338, 340–41, 5 L.Ed.2d 329 (1961).

The writ of habeas corpus *ad prosequendum* is not a "detainer" within the meaning of the Interstate Agreement on Detainers. *United States v. Mauro*, 436 U.S. 340, 349, 98 S.Ct. 1834, 1841, 56 L.Ed.2d 329 (1978). But when the prosecution initially files a detainer against a prisoner, and later seeks custody by means of the writ, the provisions of the IAD are activited nonetheless. *Id.* at 361–62, 98 S.Ct. at 1847–48. Because Arizona filed a detainer before presenting the writ, the district court's mischaracterization does not affect our disposition of the case.

1397 (1970), *codified at* 18 U.S.C. app. §§ 1–8 (1982).[2]

The Warden challenges the injunction on three grounds. First, he contends that the district court interfered with pending state criminal proceedings and thereby offended the doctrine of equitable restraint as articulated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Second, the Warden argues that under the peculiar circumstances of this case, the IAD *required* Arizona temporarily to return Burrus to federal custody, and therefore that the IAD cannot now penalize Arizona for attempting to resume its prosecution of him. Third, the Warden asserts that Burrus, not Arizona authorities, prevented the trial from taking place before the IAD's speedy trial deadline had expired. According to the Warden, Burrus asked for and received a lengthy pretrial continuance that made it impossible for Arizona to bring Burrus to trial on time.

For the reasons expressed below, we reject all of these arguments and affirm the district court.

## BACKGROUND

### A. *Interstate Agreement on Detainers*

The United States and Arizona are parties to the IAD, a compact designed, according to article I, to "encourage the expeditious and orderly disposition of [outstanding criminal] charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." Each state that is party to the compact has enacted and codified the IAD as its own law. *See* 18 U.S.C. app. § 2 (1982); Ariz.Rev.Stat.Ann. § 31–481 (West 1976). Article II(a) defines the United States as a "state" for purposes of administering the agreement.

■ The detainer is central to the administration of the IAD. A detainer is simply a document notifying one state (the sending state) that another state (the receiving state) wants to prosecute a prisoner that the sending state is holding. Once lodged with the sending state, a detainer remains in effect indefinitely, and therein lies the problem. Before the IAD, the sending state was under no compulsion, other than comity, to send the prisoner to the receiving state. Usually, however, the sending state did transfer the prisoner. But having accepted the transfer, the receiving state could prosecute immediately, retain custody but postpone the trial, or shuttle the prisoner back to the sending state until the receiving state was ready to proceed against him and renew its request for custody [3]—all while the detainer remained in effect.

Thus, the detainer has several deleterious effects. First, it may make the prisoner ineligible for desirable work or educational assignments. If the prisoner is constantly shuttled from one facility to another, prison officials may be reluctant to permit him to participate in rehabilitation programs. Second, a detainer reduces the prisoner's incentive to participate in work, education, and other programs that help rehabilitate him and improve his chances for early parole. Uncertain whether he will have to serve another, non-concurrent sentence in the future, the prisoner loses his interest in improving himself in the present. Third, a detainer tells the prisoner that he may have to stand trial elsewhere, but does not provide him with a vehicle for going there immediately to secure witnesses and take other steps to preserve his defense. *See, e.g., United States v. Mauro,* 436 U.S. 340, 358 n. 25, 360, 98 S.Ct. 1834, 1846 n. 25, 1847, 56 L.Ed.2d 329 (1978) (citing authoritative sources); *accord United States ex rel. Esola v. Groomes,* 520 F.2d 830, 837 (3d Cir.1975).

---

**2.** The IAD is reprinted in an appendix to title 28 of the United States Code. The IAD articles that we discuss here are all found in section 2 of the appendix.

**3.** *But see Smith v. Hooey,* 393 U.S. 374, 380, 383, 89 S.Ct. 575, 578, 579, 21 L.Ed.2d 607 (1969) (holding that the sixth amendment commands, though very generally, that a state must "make a diligent, good-faith effort" to bring a prisoner to trial).

Before the IAD existed, some prison officials and state prosecutorial authorities abused the detainer system. Sometimes, authorities in potential receiving states lodged detainers not to obtain prisoners for the purpose of putting them on trial, but instead to make life more difficult for them in the prisons where they were already incarcerated. *See, e.g., United States v. Ford*, 550 F.2d 732, 737–40 (2d Cir.1977) (recounting cases of such abuse), *aff'd sub nom. United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

To correct these evils, article III(a)[4] gives the prisoner the right to demand that the receiving state swiftly dispose of any outstanding charges:

> [W]henever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment ... on the basis of which a detainer has been lodged against the prisoner, *he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer ...* written notice of the place of his imprisonment and *his request for a final disposition* to be made of the indictment ....

18 U.S.C. app. § 2, art. III(a) (1982) (emphasis added).

Furthermore, article III(d)[5] penalizes the receiving state for failure to prosecute a prisoner transferred under the IAD:

4. Under a companion provision, the receiving state's prosecuting authority may on its own motion dispose of outstanding charges against a prisoner detained in another state. Article IV(a) provides:
   > The appropriate officer of the jurisdiction in which an untried indictment ... is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available ... upon presentation of a written request for temporary custody ....

   Article IV(c) adds:
   > In respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State ....

5. The companion provision, article IV(e), provides:
   > If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the

If trial is not had on any indictment, information, or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, *such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.*

*Id.* art. III(d) (emphasis added).

Finally, article V(g) vests the sending state with jurisdiction over the prisoner for all purposes other than final disposition of outstanding indictments in the receiving state:

> For all purposes other than that for which temporary custody as provided in this agreement is exercised, *the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending state ....*

*Id.* art. V(g) (emphasis added).

### B. *Procedural Posture*

■ Burrus, a federal prisoner at the Englewood Federal Correctional Institution in Colorado, learned that the State of Arizona had lodged a detainer against him with federal authorities. On November 23, 1980, pursuant to article III of the IAD, he filed[6] a request asking Arizona to dispose of all outstanding charges against him.[7]

original place of imprisonment ... such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

6. Burrus actually sent the appropriate papers some days earlier, but article III began to run on the date that the officials of the receiving state took delivery of those papers. For IAD purposes, then, Burrus "filed" on November 23, 1980.

7. The Warden contends that article IV governs this case. According to the Warden, if article IV(c) applies, Arizona still has time to try Burrus because 120 days did not pass between the date that Burrus arrived in Arizona and the date that Arizona sent him back to federal custody.

   The record demonstrates otherwise. Burrus invoked article III by requesting a speedy disposition of the outstanding Arizona charges. Ari-

Arizona accepted that request, and on February 11, 1981, federal authorities transferred Burrus to the custody of Arizona authorities.

The State arraigned Burrus in Maricopa County Superior Court on February 20 and later set various trial dates. Along the way, both sides made several motions. On March 20, Burrus asked for and received a 32-day continuance of the deadline for filing pre-trial motions. Later, the trial court, acting sua sponte, twice continued the original trial date of April 8—initially to May 11, then to May 21.

On May 21, Burrus filed a motion to dismiss the Arizona indictment. He argued that in failing to bring him to trial by May 12, 1981, Arizona had violated the state's own speedy trial rule. *See* Ariz.R.Crim.P. 8.3(a).[8] Rule 8.3(a) reinforces Arizona's adherence to the IAD's speedy trial provisions. It required Arizona to try Burrus within 90 days of his delivery into Arizona's temporary custody. On May 22, 179 days after Burrus had filed his request for speedy disposition of the outstanding charges (but 100 days after federal authorities had delivered him to Arizona), the Maricopa County Superior Court dismissed the indictment with prejudice pursuant to Rule 8.3(a). *State v. Burrus*, Crim. No. 106900 (Ariz.Super.Ct. Maricopa County May 22, 1981) (Myers, J.) (unpublished order). Arizona authorities returned Burrus to federal custody at Englewood on May 29, and the

Maricopa County sheriff officially withdrew the Arizona detainer against him on June 6.

Meanwhile, on May 22, Arizona appealed the superior court's decision. On October 7, 1982—almost a year-and-a-half later—the Arizona Court of Appeals reversed the dismissal, reinstated the indictment, and remanded the case for trial. *State v. Burrus*, 134 Ariz. 251, 655 P.2d 371 (App.1982). The state appeals court ruled that by obtaining his lengthy continuance, Burrus had waived his right under Ariz.R.Crim.P. 8.3(a) to be tried within 90 days of arriving in the state, and that Arizona had 32 more days in which to put Burrus on trial. *Id.* at 253, 655 P.2d at 373. On December 29, 1982, Burrus received notice that Arizona had renewed its demand for temporary custody, this time by obtaining a writ of habeas corpus *ad prosequendum* in Maricopa County Superior Court.

Burrus, now imprisoned in the federal penitentiary at Pleasanton, California, decided to explore two separate avenues in his search for relief. First, he petitioned the Arizona courts. He reasoned that even if Arizona had complied with its own speedy trial law, the state had nevertheless violated the IAD. He asked the state superior court to quash the writ of habeas corpus *ad prosequendum* and to dismiss the reinstated indictment because Arizona, in failing to try him before sending him

---

zona accepted this request. Letter from Jeffrey L. Arbetman, Assistant Attorney General, State of Arizona, to John T. Hadden, Warden, Englewood Federal Correctional Institution, at 2 (Jan. 13, 1981). Therefore, article III governs.

**8.** Ariz.R.Crim.P. 8.3(a) provides:

Within 90 days after receipt of a written request from any person charged with a crime and incarcerated without the state ... the prosecutor shall take action as required by law to obtain such person's presence for trial. *Within 90 days after the defendant has been delivered into the temporary custody of the appropriate authority of this state, he shall be brought to trial.*

(Emphasis added.)

The legislative history reveals that Rule 8.3 is designed "primarily to supplement the provisions of the Interstate Agreement on Detainers."

Ariz.R.Crim.P. 8.3(a) comment, para. 2. The rule's framers also said the rule means that the prisoner "must" be tried within 90 days, and that a violation of this time limit constitutes grounds for "dismissal of the charges with prejudice." *Id.* comment, para. 4.

In this case, the Maricopa County Superior Court dismissed the indictment precisely because Arizona failed to adhere to these stringent commands. Originally, the superior court, the prosecution, and defense counsel all thought that a different Arizona Rule of Criminal Procedure governed the case. That other rule, which governs prisoners already held within Arizona, would have permitted Arizona to try Burrus by May 21 instead of by May 12. Later, however, defense counsel realized that Burrus was an out-of-state prisoner who was temporarily in Arizona's custody, and petitioned the superior court to correct the error accordingly.

back to federal custody, had violated article IV(e) of the IAD. The superior court denied the requests. *State v. Burrus,* Crim. No. 106900 (Ariz.Super.Ct. Maricopa County Jan. 12, 1983) (Derickson, J.) (unpublished order). Burrus also asked the superior court to dismiss the reinstated indictment because Arizona, in failing to try him before returning him to federal custody, had violated article III(d). The superior court granted this motion. *State v. Burrus,* Crim. No. 106900 (Ariz.Super.Ct. Maricopa County Mar. 24, 1983) (Patterson, J.) (unpublished order). Burrus appealed the former ruling and Arizona the latter to Division One of the Arizona Court of Appeals, where both matters are still pending.

Second, Burrus petitioned the federal courts. He filed a pro se petition in the Northern District of California seeking three types of relief: a "Writ of Habeas Corpus ... to quash" Arizona's writ of habeas corpus *ad prosequendum,*[9] a declaratory judgment setting aside the Arizona writ as unlawful under the IAD, and a permanent injunction preventing the Warden from surrendering Burrus to Arizona for the purpose of prosecuting the untried indictment.

The Warden, appearing through the United States Attorney, and Arizona, appearing through its attorney general, opposed the motions. The district court denied habeas as "not proper under the circumstances," but granted the permanent injunction.[10] Relying on the plain language of article III(d), the court ruled that the Arizona indictment had no further force or effect. *Burrus v. Turnbo,* Civ. No. 83–0247–RHS (N.D.Cal. Mar. 7, 1983) (unpublished order).

The Warden brought the appeal now before us. The United States Attorney filed a brief arguing the cause on behalf of the Warden and, apparently, the State of Arizona.

On appeal, Burrus says that this is the very type of case the IAD was designed to prevent. He claims that permitting the Warden to shuttle him back to Arizona will once again interrupt his college education, impair his efforts to obtain a favorable prisoner classification, and postpone his double hernia operation.

## STANDARD OF REVIEW

To issue a permanent injunction, the district court must find that the movant has no adequate remedy at law and will suffer irreparable harm if the court denies equitable relief. *See, e.g., Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55, 3 L.Ed.2d 988 (1959). The decision to grant or deny injunctive relief " 'rests with the sound discretion of the trial court and ... will not be disturbed unless there has been a clear abuse of it.' " *SEC v. Arthur Young & Co.,* 590 F.2d 785, 787 (9th Cir.1979) (citation to quotation omitted). Nevertheless, conclusions of law upon which the injunction is based "are freely reviewable." *Sports Form, Inc. v. UPI,* 686 F.2d 750, 752 (9th Cir.1982).

## ANALYSIS

The Warden contends that the *Younger* doctrine, the terms of the IAD itself, and Burrus's motion to continue his trial—which allegedly constitutes a waiver of his speedy trial right under the IAD—all require us to reverse the district court. We consider each argument in turn.

### A. *The Younger Doctrine*

*Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), stands for the proposition that our system of government does not permit a federal court to enjoin state court proceedings absent very special circumstances. *Id.* at 43, 91 S.Ct. at 750. "Our Federalism" recognizes state governments as separate and independent sovereigns whose courts retain great power to experiment with the law and interpret the Constitution—at least in the first in-

---

**9.** Complaint for Petitioner at 1, *Burrus v. Turnbo,* Civ. No. 83–0247–RHS (N.D.Cal. Mar. 7, 1983)

**10.** Apparently, the district court did not rule on the request for declaratory relief.

stance—for themselves. *Id.* at 44, 91 S.Ct. at 750; *accord Douglas v. City of Jeannette,* 319 U.S. 157, 163, 63 S.Ct. 877, 880–81, 87 L.Ed. 1324 (1943); *Ex Parte Young,* 209 U.S. 123, 161–63, 28 S.Ct. 441, 454–55, 52 L.Ed. 714 (1908).

The Warden argues that the district court has offended the branch of the *Younger* doctrine banning piecemeal intervention in state court proceedings. *See, e.g., Perez v. Ledesma,* 401 U.S. 82, 84, 91 S.Ct. 674, 676, 27 L.Ed.2d 701 (1971). Even though the district court directed its order to the Warden, a federal official, that court effectively held up the State of Arizona's attempt to prosecute Burrus. The Warden contends that we should abstain and permit the Arizona Court of Appeals to decide whether the state is entitled to regain temporary custody of Burrus.

█ The paradigm *Younger* problem arises when a state criminal defendant, fearing a violation of his federal constitutional rights in a pending prosecution, petitions a federal court to restrain the state court from proceeding against him. *E.g., Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *see also Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1318 (1977) (extending outline of paradigm *Younger* case to some non-criminal state proceedings). The *Younger* doctrine counsels restraint in these cases because

> federal equitable intervention is not warranted if the federal plaintiff [i.e., the state defendant] can secure a full and fair day in court on his [federal] constitu-

tional claims by raising them by way of defense in a state enforcement proceeding which is already underway or is imminent anyway. The central notion is that defending the state prosecution provides an adequate remedy, one that is the substantial equivalent of the remedy available in the federal court.

P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* 283 (Supp.1981); *accord id.* at 1043 (2d ed. 1973) ("[T]he principal thrust of the [ ]Younger doctrine is that a state criminal defendant's *federal* constitutional rights should usually be raised and definitively adjudicated in the state criminal case . . . ." (emphasis in original)).

█ But *Younger* is inapposite here for three reasons.

First, the case before us involves a supervening law, the IAD. The IAD is a treaty between two separate and independent sovereigns, the United States and Arizona. By signing the treaty, each gave up part of its "right" to hold prisoners that the other sovereign wants. *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 835 (3d Cir.1975).[11] In exchange, each obtained the right, if it meets certain conditions outlined in the compact, to obtain wanted prisoners from the other sovereign. Before the IAD existed, neither sovereign could compel the other to hand over prisoners like Burrus. *See generally Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). Now they can.

What this means is that Burrus is *not* asking a federal court to eliminate the prerogative of a sovereign state's court to interpret the federal Constitution in the first instance. Instead, he *is* asking a federal court to decide whether the United

---

**11.** The Third Circuit explained in full:

> The Federal Government, through joinder in the Agreement, forfeited its right to exclusive control over [a federal prisoner] during the term of the sentence imposed by the district court. Concomitantly, the United States gained the right not to have its various rehabilitative programs unduly hampered by numerous, unnecessary transfers to a jurisdic-

tion with outstanding criminal charges. In short, the Agreement cannot be viewed as a single enactment by a single legislative body. *Rather it is a law binding on at least two sovereigns . . . . Rights arising under the Agreement flow from the actions of both of the party jurisdictions.*

*United States ex rel. Esola v. Groomes,* 520 F.2d 830, 835 (3d Cir.1975) (emphasis added).

States would violate its treaty with Arizona if the Warden retransferred Burrus to Arizona. Because a violation of the IAD offends not only state, *see* Ariz.Rev.Stat.Ann. § 31–481 (West 1976), but also federal, *see* 18 U.S.C. app. § 2 (1982), law, jurisdiction to adjudicate IAD violations lies co-equally with both sovereigns.

Therefore, the usual notions about comity do not obtain. The United States has as much right as Arizona to police the IAD and to wrestle in the first instance with substantial federal questions arising from it. *See Cuyler v. Adams*, 449 U.S. 433, 442, 101 S.Ct. 703, 709, 66 L.Ed.2d 641 (1981) ("[T]he Detainer Agreement is a congressionally sanctioned interstate compact the interpretation of which presents a question of federal law."); *Tinghitella v. California*, 718 F.2d 308, 311 (9th Cir.1983) (per curiam) (citing with approval *Cuyler v. Adams*); *see also Brown v. Wolff*, 706 F.2d 902, 904–05 (9th Cir.1983) (Because the IAD is federal law, a federal district court may grant habeas corpus relief under 28 U.S.C. § 2254 (1982) to remedy violations of the compact); *Bedwell v. Harris*, 451 F.2d 122, 122 (10th Cir.1971) (per curiam) ("In a proper case it is the duty of the federal court to relieve a prisoner from the burden of a state detainer and the court has jurisdiction to do so.").

Second, the IAD itself suggests that in this case, jurisdiction properly lies in federal rather than state court. Article V(g) says that for all purposes other than the receiving state's disposition of outstanding charges, the sending state—here, the federal sovereign—retains jurisdiction over the prisoner.[12]

The case before us is not an appeal from a judgment on the merits of the charges that Arizona has preferred against Burrus. Instead, it is an appeal from the district court's determination that the United States will participate in a violation of article III(d) if the Warden transfers Burrus back to Arizona. Therefore, article V(g) vests us with jurisdiction to relieve Burrus of this burden.

Third, as long as Burrus remains a federal prisoner in federal custody, only the federal authorities can send him to Arizona again. Consequently, an injunction preventing Burrus's transfer to Arizona must be directed to the Warden, and only a federal district court can issue such an injunction. *Cf. Tarble's Case*, 80 U.S. (13 Wall.) 397, 20 L.Ed. 597 (1871) (denying state courts authority to issue writs of habeas corpus on behalf of prisoners in federal custody).

Because the *Younger* doctrine does not apply to this case, we proceed to the merits.

### B.  *Applying the IAD*

1. *Warden's interpretation of article III(d).* Relying on article III(d), the district court ruled that Arizona had violated the IAD. Article III(d) simply says that if the receiving state fails to bring a prisoner to trial, the trial court must "enter an order dismissing the [indictment] with prejudice." Applying the Arizona Rules of Criminal Procedure, which supplement the IAD, the Maricopa County Superior Court did exactly that. As a result, the federal district court enjoined the Warden from returning Burrus to Arizona.

The Warden wants this court to apply a strained interpretation of the IAD to this case. The Warden contends that when the superior court dismissed the indictment with prejudice, the court had entered a "final disposition" within the meaning of article III. Without a valid indictment, Arizona no longer had any basis for holding Burrus, so it had to return him to federal custody. Now that the Arizona Court of Appeals has reinstated the indictment, however, the disposition is no longer "final" and Arizona again has jurisdiction to prosecute.

This argument fails to square not only with the plain terms of article III(d), but also with the purpose behind the IAD. The member states adopted the IAD to promote the speedy disposition of outstanding

---

**12.**  *See supra* p. 4 (quoting article V(g)).

charges and to mitigate the evils that resulted from shuttling prisoners to and from states that had lodged detainers. *See, e.g., Mauro*, 436 U.S. at 360, 98 S.Ct. at 1847; *United States v. Dixon*, 592 F.2d 329, 334 (6th Cir.) (citation omitted), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). The Warden's reading of article III would turn the meaning of the IAD upside-down. In interpreting the speedy trial provision of article IV, which is virtually identical to that in article III, the Supreme Court held that the terms of the IAD mean what they say:

> [W]e view Art. IV(a) as requiring commencement of trial within 120 days whenever the receiving State initiates the disposition of charges underlying a detainer it has previously lodged against a state prisoner. Any other reading of this section would allow the Government to gain the advantages of lodging a detainer against a prisoner without assuming the responsibilities that the Agreement intended to arise from such an action.

*Mauro*, 436 U.S. at 364, 98 S.Ct. at 1849 (footnotes omitted).

█ We think the mandatory language and stringent penalties that the IAD sets out require party states to adhere strictly to the compact's provisions. *See United States v. Eaddy*, 595 F.2d 341, 346 (6th Cir.1979); *see also Hughes v. District Court*, 197 Colo. 396, 593 P.2d 702, 705 (1979) (discussing absoluteness of IAD's terms). Therefore, we reject the Warden's strained interpretation of the treaty.

2. *Burrus's motion for continuance and the 32-day delay.* On March 20, 1981, Burrus successfully moved the superior court for a 32-day continuance so that he could prepare various pre-trial motions. The Warden argues that because Burrus caused this delay, Burrus has waived his speedy trial right. As a result, Arizona may obtain Burrus for the purpose of bringing him to trial in the month that remains on his speedy trial clock.

█ A prisoner's speedy trial right under the IAD is personal to him. Therefore, by delaying the state's attempt to bring him to trial, a prisoner may waive that right. *See, e.g., Brown v. Wolff*, 706 F.2d 902, 907 (9th Cir.1983); *United States v. Black*, 609 F.2d 1330, 1334 (9th Cir.1979), *cert. denied*, 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 56 (1980).

█ We agree with both the Warden and the Arizona Court of Appeals that the state should have excluded the 32 days from its speedy trial calculations. Nonetheless, we find the Warden's contention now irrelevant. Article III(d) gives the receiving state one opportunity to try a prisoner in its temporary custody. If it returns the prisoner to the sending state before doing so, the treaty's plain terms declare that the pertinent "indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

█ In the case before us, Arizona failed to put Burrus on trial before it returned him to federal custody. This act brought the curtain down on Arizona's prosecution. The reason *why* Arizona failed to put Burrus on trial is of no moment. It happened, in this case, that Arizona returned Burrus to federal authorities because the superior court found that the state had violated its own speedy trial rule and dismissed the indictment. Later, the state's court of appeals disagreed with the superior court's reading of the rule and reinstated the indictment. But once Arizona returned Burrus before completing the prosecution, the state automatically lost its right to obtain temporary custody under article III(d). *See United States v. Cyphers*, 556 F.2d 630, 635 (2d Cir.) (interpreting companion provision in article IV(e)), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977).

The Warden responds that our decision in *Brown v. Wolff* reads article III(d) differently. We disagree. In *Wolff*, we held the State of Nevada had not violated article III(d)'s 180-day speedy trial provision. We found that the prisoner, by explicitly agreeing to two lengthy continuances, had

waived his right to be tried within article III(a)'s speedy trial period.

■ The critical difference between *Wolff* and this case is that in *Wolff*, Nevada never returned the prisoner to the sending state. In this case, however, Arizona transferred Burrus back to federal custody. Arizona could have maintained custody over Burrus by asking its court of appeals for an emergency stay or an expedited appeal. But it did not. Arizona thus forfeited its sole opportunity to prosecute Burrus without violating the anti-shuttling provision in article III(d).

### CONCLUSION

■ In light of the above analysis, we conclude that the district court did not abuse its discretion by permanently enjoining the Warden from honoring Arizona's renewed demand for temporary custody. Because Burrus had no adequate remedy at law that would have preserved his rights under the IAD, we also conclude that the district court properly exercised its equitable power to grant an injunction.

The judgment is AFFIRMED.