**UNITED STATES of America, Plaintiff,**

v.

**Clifford Jay BALLAM, Defendant.**

**No. CR–N–93–28–DWH.**

United States District Court,
D. Nevada.

July 12, 1996.

---

Daniel G. Bogden and L. Anthony White, Assistant United States Attorneys, Reno, Nevada, for plaintiff.

Kristine Smith and Janet Bessemer, Federal Public Defenders, Reno, NV, for defendants.

## ORDER

HAGEN, District Judge.

The Ninth Circuit Court of Appeals has ordered a "hearing and findings [by the district court] on [defendant Clifford Jay] Ballam's Speedy Trial Act and Sixth Amendment Claims." #38 at 8. A hearing was held June 14 and 17, 1996, and the evidence then presented, together with the evidence presented by Ballam on July 8, 1994, in support of his motion to dismiss, and the pleadings and files herein, have been considered.

## FACTS

Ballam was arrested February 20, 1993, by officers of a local law enforcement task force called Consolidated Narcotics Unit ("CNU") in connection with a "controlled buy" of methamphetamine by a confidential informant. He was charged with controlled substances offenses, possession of stolen property, and carrying a concealed weapon. Greg Bratten, a United States Drug Enforcement Special Agent, associated with CNU *ad hoc* and cross-deputized by Washoe County, Nevada, for that purpose, observed the arrest.[1]

On March 7, 1993, in the spirit of "professional courtesy" to another federal agency, and aware of a federal program [2] to discourage the use of firearms in criminal activity, Agent Bratten alerted Special Agent Brad Ehrman of the Bureau of Alcohol, Tobacco, and Firearms to Ballam's use of a firearm related to the State offense. Agent Ehrman investigated and then in early April, 1993, advised Assistant United States Attorney Daniel Bogden that Ballam was a felon who had used in the commission of a controlled substances offence a firearm which had traveled in interstate commerce. On April 14, 1993, he gave AUSA Bogden his official report in the matter which, on that day, was presented to the Grand Jury. An indictment was issued immediately, as well as a warrant for Ballam's arrest. Knowing Ballam to be facing pending State charges, AUSA Bogden informed the Washoe County District Attorney's Office of the federal action.

Ballam was not then in State custody, having been admitted to bail promptly after his State booking following the February 20, 1993 arrest. Therefore, Agent Ehrman began looking for him. So did other officers, the federal warrant having been placed in National Criminal Identification Center ("NCIC") records, to alert law enforcement that a wanted person was at large.[3]

By May 25, 1993, Agent Ehrman was directly assisted in his search for Ballam by Sparks Justice Court Marshal Bohl, who was looking for Ballam on a Sparks Justice Court warrant in an unrelated matter. On May 27, 1993, the State charges against Ballam were dismissed for reasons not disclosed in this record.

Marshal Bohl took the search as a challenge because his past experience with Ballam convinced him Ballam would be difficult to find. He devoted forty to sixty hours to the search over two months. He staked out residences and a known hangout, interviewed

---

1. Also, before the arrest, he had tape recorded a telephone conversation between a confidential informant and defendant for CNU.

2. The program is known as "Trigger Lock."

3. On March 24, 1993, Ballam was indicted by the State grand jury and a State bench warrant was issued for him, with the notation that he would not be required to post additional bail. At some moment later, State authorities informed NCIC Ballam was a fugitive.

associates, and on three or four occasions, unassisted, knocked on the door where Ballam was thought to live, leaving his card when he got no answer. He interviewed about a dozen of Ballam's associates. Marshal Bohl managed to spot Ballam twice, once when Ballam was driving his mother's car, but he could not safely take pursuit because of other drivers on the roadway.

Agent Ehrman, also searching diligently, was more cautious. Because Ballam was said to have displayed a handgun to an undercover agent, saying he would shoot her with it if he learned she was an agent, Agent Ehrman said he chose to *surveil*[4] Ballam's believed residence rather than knock on the door. He devoted a substantial amount of time searching, and coordinating the search, for Ballam. In the process, he spoke with Ballam's mother by telephone, telling her of the federal warrant and asking her to ask Ballam to surrender. Ballam did not, however, attempt to communicate with Agent Ehrman or surrender. Ballam's mother, who testified also, did not remember such a call.[5]

In late July, 1993, during a routine traffic violation stop of an automobile, local police discovered controlled substances. One of the persons in the car, no doubt to ameliorate her situation, offered cooperation in the form of delivering a drug dealer—coincidentally, Ballam—to the police. A drug buy was set up for July 28, 1993, and the informant was rigged with a voice transmitter. The transaction went awry, however, and officers moved in. Sparks Detective James Beltron, aware of the federal warrant, arrested Ballam at 10:47 p.m. He was searched and found to be in possession of methamphetamine and a syringe. He was also under the influence of a controlled substance.

Ballam was booked at Washoe County Jail on State narcotics charges.. The next morning Agent Ehrman learned of the arrest and U.S. Marshal Joe Sullivan was alerted. On July 29, 1993, Marshal Sullivan sought and received a facsimile message from the Washoe County Sheriff confirming Ballam was in custody on pending State charges. Marshal Sullivan then promptly placed a detainer on Ballam with the Washoe County Sheriff.[6] It does not appear the sheriff informed Ballam of the detainer, although the detainer requested the sheriff to do so. # 16 Ex. A.

On July 30, 1993, U.S. Magistrate Judge Phyllis H. Atkins appointed Jerome Polaha to represent Ballam. Ballam claims never to have spoken with him.

On November 10, 1993, AUSA Bogden received a telephone message from Donald Cavin Hill, a Reno attorney, asking for a return call concerning Ballam. After an exchange or two of telephone messages[7], they spoke. Mr. Hill said he was Ballam's attorney and thought Ballam was in custody on pending federal charges. AUSA Bogden responded he was certain Ballam was in custody on pending State charges, but offered to check. Also, he told Mr. Hill he had been informed Ballam was represented by Criminal Justice Act counsel Polaha. Mr. Hill responded he would check with the appointing magistrate judge. Mr. Hill had been appointed by the magistrate judge as counsel for Ballam on October 26, 1993, six months and twelve days after the indictment; and almost three months after the detainer.[8]

AUSA Bogden, having doublechecked Ballam's status, confirmed to Mr. Hill that Ballam was being held on State—not federal—charges. He also had checked with the

---

4. A verb probably coined by law enforcement, from the French *surveiller,* to watch over.

5. Mrs. Ballam also explained a severe and complicated heart condition during 1993 caused her to lose much memory of that period. Her testimony of not remembering a call from Agent Ehrman is viewed in that context and given little weight.

6. By this, Marshal Sullivan activated the provisions of the Interstate Agreement on Detainers ("IAD"), 18 U.S.C. app. 2.

7. From the Fall of 1993 until the Spring of 1994, AUSA Bogden was in a multi-defendant criminal trial and had only one day a week for other cases.

8. Mr. Hill had learned of his appointment as Ballam's counsel shortly after his appointment, when he received a facsimile message from the Federal Public Defender of that, which message included a copy of the indictment.

Washoe County District Attorney's Office as to the progress of the State's case.

Mr. Hill, by then, had visited Ballam in custody and learned from Ballam he was in State custody. on State charges. Mr. Hill then asked AUSA Bogden to seek a writ of habeas corpus *ad prosequendum* to prosecute Ballam on the federal charges during the pendency of the State charges.[9] AUSA Bogden researched that possibility and concluded a risk was presented by the anti-shuttling provisions of the IAD. The risk was, he testified, of dismissal of the federal charges under the Agreement's anti-shuttling provisions if Ballam were "writted" to federal court before the State case had been completed and had to be returned to the State proceedings before the federal case was completed.[10]

As a courtesy to Mr. Hill, AUSA Bogden assembled a package of discovery materials related to the federal case and on December 10, 1993, mailed them to him, together with a U.S.S.G. offense level analysis, in the belief a plea agreement would reduce the anti-shuttling risk he perceived. Mr. Hill, however, according to AUSA Bogden, did not pursue a plea at that moment, seeming to consider the writ alone to be the first order of business. Mr. Hill did not respond in writing to the letter, but recalls he never thought of this case other than one to be plea bargained.

AUSA Bogden began to assemble a draft plea agreement. At about this time, in January, 1994, he learned from the Washoe County Deputy District Attorney that Ballam would be tried in State court for a gross misdemeanor and, if convicted, the prosecutor would seek a sentence of time served. On January 25, 1994, AUSA Bogden wrote to Mr. Hill of this, and also enclosed a draft plea agreement. He urged Mr. Hill to communicate with Ballam's State court counsel. Mr. Hill did not respond to this letter.

On March 11, 1994, Ballam was sentenced by the State court to time served. At the sentencing hearing, the Washoe County Deputy District Attorney announced in open court the federal charges awaiting Ballam, and their penal significance. The Washoe County Sheriff, however, did not then inform the U.S. Marshal of the completion of the State case. The U.S. Marshal did not learn until mid-May, 1994, that Ballam's State case had been completed. Ballam promptly was arrested at Washoe County Jail on the federal charges, and arraigned on May 23, 1994.

Ballam moved to dismiss the indictment June 6, 1994, on the Sixth Amendment and Speedy Trial Act grounds at bench. At calendar call, July 6, 1994, that motion was scheduled for argument two days later, and trial was scheduled for July 12, 1994. On July 11, 1994, Ballam entered a plea of guilty pursuant to a plea agreement made July 8, 1994, and also presented evidence in support of his motion to dismiss. No findings were made on that motion, however, in error.[11]

## ANALYSIS

The Ninth Circuit Court of Appeals has remanded for a hearing and findings on Ballam's Sixth Amendment and Speedy Trial Act claims. The former has been done; the requested findings follow.

### I. Ballam's Sixth Amendment Claim

With respect to Ballam's Sixth Amendment claim, the following time periods are relevant:

> Three months and fourteen days elapsed from his federal indictment to his arrest by Sparks Detective Beltron and booking on State charges.

---

9. It is unclear when this request was made; Mr. Hill could not recall whether he made it before or after December 10, 1993, the date of AUSA Bogden's first letter to Mr. Hill. It will be taken to have been made just before that day, because this is consistent with AUSA Bogden's testimony.

10. His concern was plausible; had this happened, and were the IAD applicable in the case of State charges which had not yet resulted in a conviction, the federal indictment would "not be of any further force or effect." 18 U.S.C. app. 2, § 2, art. IV(e).

11. A minute order of July 1, 1994, perfunctorily had denied a discovery motion *and* the motion to dismiss. Inclusion of the latter in the minute order is puzzling and may have been inadvertent, but apparently is unrelated to the court's failure to make findings on Ballam's motion to dismiss after the July 11, 1994 hearing.

Seven months and fourteen days elapsed from then until the State case ended.

Two months and two days elapsed until the Washoe County Sheriff informed the U.S. Marshal Ballam was available for federal arrest.

One month and twenty-nine days elapsed from then to his trial setting in federal court, a day before which he entered his guilty plea.

The Ninth Circuit's memorandum calls for the four-part test under *Doggett v. United States*, 505 U.S. 647, 650–51, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992) (the *Barker* factors, from *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972)) to determine whether Ballam's Sixth Amendment right to a speedy trial was violated.

■■■■ The first *Barker* factor is whether the delay before trial was uncommonly long. This inquiry involves two steps. *United States v. Beamon*, 992 F.2d 1009, 1012 (9th Cir.1993). The accused must first show that the delay passes a threshold point of "presumptively prejudicial" delay. *Id.* The Ninth Circuit memorandum in this case has identified a judicial consensus that such is the case here, noting a range of eight months to one year as the range of presumed prejudicial delay and that "thirteen months elapsed between Ballam's indictment and his first appearance before a magistrate." # 39 at 5. Ballam having made a threshold showing of presumed prejudicial delay, the court next "considers the extent to which the delay exceeds the threshold point in light of the degree of diligence by the government and acquiescence by the defendant to determine whether sufficient prejudice exists to warrant relief." *Beamon*, 992 F.2d at 1012. In other words, with the length of delay in mind, the court looks to the second, third, and fourth *Barker* factors.[12]

■■■ The second *Barker* factor asks which party was to blame for the delay. The court finds that Ballam was to blame for the approximately three-and-a-half month period between the federal indictment and the second State arrest. Special Agent Ehrman, assisted by Marshal Bohl, was diligent in his search for Ballam, who never surrendered himself after being released on bail following his first State arrest. Minus this three-and-a-half-month period, the delay in this case does not exceed "the one year benchmark in *Doggett*" which triggers a speedy trial inquiry.

■■■ Neither the government nor Ballam appears significantly more to blame for the remainder of the delay. In response to counsel's requests to have Ballam writted into federal custody before the resolution of the State charges, AUSA Bogden reasonably decided not to pursue a writ of habeas corpus *ad prosequendum* because of the anti-shuttling provisions of the IAD. Although the IAD generally does not apply to State prisoners merely awaiting trial in State court, *see United States v. Packer*, 857 F.Supp. 726, 728 (C.D.Cal.1994), here the government had filed a detainer. Thus, under *United States v. Mauro*, 436 U.S. 340, 361–62, 98 S.Ct. 1834, 1847–48, 56 L.Ed.2d 329 (1978), obtaining Ballam by means of a subsequent writ of

---

12. In its memorandum, after finding that Ballam made the threshold showing of prejudicial delay, the Ninth Circuit stated, "Ballam's claim depends upon the remaining two factors: which party is more to blame for the delay, and whether Ballam requested a speedy trial." # 39 at 5. The panel did not explain why the fourth factor—prejudice—should play no part in the analysis. In *Beamon*, however, the court noted that it previously "interpreted *Doggett* as holding that 'no showing of prejudice is required when the delay is great and attributable to the government.'" 992 F.2d at 1013 (citing *United States v. Shell*, 974 F.2d 1035, 1036 (9th Cir.1992)). The *Beamon* panel then concluded that the delays at issue in *Beamon*—seventeen and twenty months—were not "great" compared to the eight-year delay in *Doggett* and the five-year delay in *Shell*. 992 F.2d at 1014. The panel therefore concluded that it had to "consider the amount of delay in relation to particularized prejudice." *Id.* The delay here of thirteen months between indictment and initial appearance is even less than the delays in *Beamon*. Also, the Ninth Circuit panel here did not find that the delay was attributable to the government; indeed, the panel identified the issue of which party was more blameworthy for the delay as a factual dispute for this court to resolve. Accordingly, the court will consider the fourth *Barker* factor—actual prejudice—as well as the two identified by the panel. The parties also addressed the fourth factor at the hearing.

habeas corpus *ad prosequendum* arguably would have activated the anti-shuttling provisions of the IAD. At the hearing, AUSA Bogden testified that his research on the issue at the time yielded the Ninth Circuit's opinion in *Burrus v. Turnbo*, 743 F.2d 693 (9th Cir.1984), *vacated as moot*, 474 U.S. 1016, 106 S.Ct. 562, 88 L.Ed.2d 548 (1985). In that opinion, the court noted that a writ of habeas corpus *ad prosequendum* is not a "detainer" under the IAD, but the provisions of the IAD are nevertheless activated "when the prosecution initially files a detainer against a prisoner, and later seeks custody by means of the writ." *Id.* at 695 n. 1 (citing *Mauro*, 436 U.S. at 361–62, 98 S.Ct. at 1847–48). Additionally, Ballam's counsel did not respond to AUSA Bogden's correspondence of a draft plea agreement in January of 1994.[13] Hence, the roughly seven-and-a-half-month delay until the resolution of the State case cannot be blamed on the federal government.

■ The next period of delay—the approximately two-month period in which Ballam remained in State custody following the resolution of the State case—appears primarily attributable to the negligence of the jailors in failing to notify the federal government of the resolution of the State case pursuant to the detainer. Perhaps the federal authorities should have alerted themselves to the resolution of Ballam's State case since they were aware of its imminent resolution. On the other hand, it also must be remembered that Ballam was represented by counsel during this period and was aware there were federal charges pending against him, yet he made no speedy trial demands. All in all, consideration of blame for the delay therefore weighs against dismissing the charges.

■ The third *Barker* factor inquires whether Ballam asserted his right to a speedy trial. Ballam stresses that his counsel, Mr. Hill, asked AUSA Bogden to seek custody of Ballam by way of a writ of habeas corpus *ad prosequendum* before the State charges were resolved. Hill testified by affidavit that he made such a request on "at least two occasions," and that the purpose of the requests was "so that Mr. Ballam might plead guilty before the disposition of his case in State Court." # 25 ¶ 5. AUSA Bogden's testimony confirms that at least one such request was made. Thus, Ballam did assert his desire for a speedy *disposition* of the federal charges. However, Ballam did not assert any interest in proceeding to trial on those charges. The Ninth Circuit has noted that "the failure of a defendant to press for trial on the merits 'is entitled to strong evidentiary weight in determining whether the defendant [was] deprived of [this] right." *United States v. Sears, Roebuck & Co.*, 866 F.2d 1128, 1134 (9th Cir.1989). Unlike in *Sears*, the record here does not suggest that the defendant sought to benefit from delay; however, as in *Sears*, the record does suggest he " 'definitely did not want to be tried.' " *Id.* (quoting *Barker*, 407 U.S. at 535, 92 S.Ct. at 2194). Accordingly, this factor weighs in Ballam's favor, if at all, only slightly.

■ The fourth *Barker* factor looks for any prejudice to Ballam from the delay. "Traditionally, actual prejudice can be shown in three ways: oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired." *Beamon*, 992 F.2d at 1014 (citing *Doggett*, 505 U.S. at 654–55, 112 S.Ct. at 2692). Ballam's asserted prejudice is that the delay allowed the State court conviction to precede the federal conviction, which had adverse effects on his federal sentencing. Specifically, Mr. Hill testified by affidavit to the following:

> That the request for [an] immediate plea of guilty by Mr. Ballam to the Federal charges was for two purposes:
>
> 1) So that Mr. Ballam could take advantage of Federal Sentencing Guideline Manual § 5G1.3(b), commentary note 2, and
>
> 2) So that Mr. Ballam would not receive additional criminal history points under United States Sentencing Guideline Manual Section 4A1.1(b)' in that he would not have been sentenced on the

---

13. These facts thus differ markedly from *Packer*, upon which Ballam relies, where there was a four-year delay attributable to the government's negligence. 857 F.Supp. at 729–32.

State charges for which he was incarcerated on thereby relieving him of an additional two points for criminal history. # 25 ¶ 6. These concerns do not show any possible prejudice to Ballam's defense against the federal charges; indeed, Ballam's concerns regarding the severity of his sentence do not speak to any of the three traditional sources of prejudice.[14]

The Ninth Circuit has not been sympathetic to claims that delay resulted in prejudice in the form of harsher sentencing. For example, in *United States v. Turner*, 926 F.2d 883, 889 (9th Cir.1991), *cert. denied*, 502 U.S. 830, 112 S.Ct. 103, 116 L.Ed.2d 73 (1991), the court found that the imposition of a longer sentence as the result of additional charges in a superseding indictment was "not the sort of prejudice [it] recognize[d] as a Sixth Amendment violation" in the context of a speedy trial claim. More recently, in the related context of a due process claim of prejudicial delay in indictment, the court rejected a defendant's claim that the federal government deliberately waited a year to indict him "so that he would have on his record a state conviction that would doom him as an armed career criminal." *United States v. Sparks*, 87 F.3d 276, 279 (9th Cir. 1996). According to the court, "[F]or the federal prosecutors to wait until he got his state sentence was not federal action prejudicial to him; his criminal history was the result of what he had done." *Id.* Likewise Ballam's.

Of course, Ballam undoubtedly was prejudiced to some degree by remaining incarcerated for two months following the resolution of the State case. The neglect of the authorities in allowing this period of incarceration is inexcusable. However, Ballam's only showing in this respect is his argument that he "languished in jail for over sixty (60) days awaiting an initial appearance which he did not receive until May 16, 1994." # 13 at 4. Thus, Ballam's showing of actual prejudice is minimal.

Considering the above factors, which, as the Supreme Court has noted, involves "a difficult and sensitive balancing process," *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193, the court finds Ballam is not entitled to the relief he seeks. In short, the delay before trial was not great, *see Beamon*, 992 F.2d at 1014, Ballam was to blame for at least as much of the delay as was the federal government, he showed no interest in actually proceeding to trial, and he has shown little cognizable prejudice from the delay.

## II. Ballam's Speedy Trial Act Claim

■ As the Ninth Circuit noted in its memorandum, 53 days elapsed between CNU's arrest of Ballam and the federal indictment. # 39 at 7. The panel also explained that the 30–day arrest-to-indictment limitation of 18 U.S.C. § 3161(b), which, if violated, requires dismissal under § 3161(a)(1), was violated here only if there was collusion between the state and federal authorities. *Id.* at 7 (citing *United States v. Benitez*, 34 F.3d 1489, 1494 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1268, 131 L.Ed.2d 146 (1995)). This is so because "Speedy Trial Act time periods may be triggered by state detentions that are merely a ruse to detain the defendant solely for the purpose of bypassing the requirements of the Act." *Benitez*, 34 F.3d at 1494.

■ Ballam has presented no evidence that AUSA Bogden, or any other federal law enforcement officer, colluded with the State authorities in order to hold Ballam under State detention and thereby avoid the 30–day time limit of § 3161(b). DEA Special Agent Bratten's presence at the February 20, 1993, arrest did not make the arrest a federal arrest, for Ballam was held "pursuant to a complaint charging [him] with violations of *state* laws." *Benitez*, 34 F.3d at 1493. As the government points out, it was not until well after the arrest, March 7, 1993, that Special Agent Bratten contacted Special

---

14. The Supreme Court has recognized that a delay in bringing a prisoner in one jurisdiction to trial on pending charges in another may result in oppression by eliminating the possibility of serving the sentences concurrently and by affecting the conditions of the prisoner's present confine-

ment. *Smith v. Hooey*, 393 U.S. 374, 378, 89 S.Ct. 575, 577, 21 L.Ed.2d 607 (1969). These concerns were not those expressed by Ballam's counsel, however, and would be of marginal weight here because Ballam was sentenced only to time served on the State charges.

Agent Ehrman and the federal authorities began prosecuting the case under the "Trigger Lock" program. In turn, it was not until even later, in early April of 1993, that AUSA Bogden was advised of the case. On April 14, 1993, the federal grand jury returned the instant indictment. The state charges were dismissed over a month later.

The above facts do not suggest that the State arrest and detention were a mere ruse to aid the federal government in avoiding the time limits of the Speedy Trial Act. Nor has Ballam presented any evidence that Special Agent Ehrman or AUSA Bogden, the federal authorities handling the federal prosecution, had any significant contact with State authorities between the time of the State arrest and the federal indictment. That the State prosecutors dismissed the State charges after the federal indictment was returned was neither unusual nor remarkable, especially given that law enforcement had been unable to find Ballam. Additionally, contrary to Ballam's assertions, and to cases in which collusion or ruse has been found, *e.g., United States v. Okuda*, 675 F.Supp. 1552, 1555 (D.Hawaii 1987) (cited in *United States v. Cepeda–Luna*, 989 F.2d 353, 357 (9th Cir.1993)), the charges filed against Ballam in the federal indictment were not identical to those in the State criminal complaint even though they arose from the same conduct. Finally, Ballam's contention that delaying the federal indictment by less than two months would ensure that Ballam would complete his State sentence before his federal sentencing is speculative at best.

In sum, the court finds there was no collusion between State and federal authorities in Ballam's state arrest and detention. Hence, the State arrest did not start the Speedy Trial Act clock under 3161(b), and the delay between the State arrest and federal indictment was not a violation of the Act.

Accordingly, **IT IS ORDERED** that defendant's request for dismissal is DENIED.